**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DANIEL RODRIGUEZ, | ) | |
| | ) | Case No. 1:22-cv-06141 |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | Hon. Edmond E. Chang |
| REYNALDO GUEVARA, GERI LYNN | ) | District Judge |
| YANOW as special representative of the | ) | |
| ESTATE OF ERNEST HALVORSEN, | ) | Hon. Sunil R. Harjani |
| ROBERT BIEBEL, EDWARD MINGEY, | ) | Magistrate Judge |
| LEE EPPLEN, EDWARD STRANDBURG, | ) | |
| JANICE RABBIT as special representative of | ) | |
| the ESTATE OF LOUIS RABBIT, GERI | ) | |
| LYNN YANOW as special Representative of | ) | |
| the ESTATE OF NOEL CAPORUSSO , | ) | |
| STEVE GAWRYS, the CITY OF CHICAGO, | ) | |
| PATRICK WALSH, and COOK COUNTY. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendants*. | | |

**FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff, DANIEL RODRIGUEZ, by his attorneys LOEVY & LOEVY,

and complaining of Defendants REYNALDO GUEVARA, GERI LYNN YANOW as special

representative of the ESTATE OF ERNEST HALVORSEN, ROBERT BIEBEL, EDWARD

MINGEY, LEE EPPLEN, EDWARD STRANDBURG, JANICE RABBIT as special

representative of the ESTATE OF LOUIS RABBIT,GERI LYNN YANOW as special

representative of the ESTATE OF NOEL CAPORUSSO  STEVE GAWRYS, , the CITY OF

CHICAGO, PATRICK WALSH, and COOK COUNTY, states as follows:

**INTRODUCTION**

1.     Plaintiff Daniel Rodriguez was wrongly convicted of the 1991 shooting death of

Jose Hernandez, Jr. He spent decades in prison for a crime that he did not commit.

2.     Plaintiff had nothing to do with the murder. Not one piece of physical evidence connected Plaintiff to the Hernandez shooting. He had no motive to commit the crime.

3.     Instead, Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence knowingly manufactured by notorious Chicago Police Detectives Reynaldo Guevara and Ernest Halvorsen, in concert with the other named Defendants.

4.     Among that fabricated evidence were two supposed eyewitness accounts implicating Plaintiff in the crime. One fabricated account was from Jason Rivera, and the other was from David Velazquez.

5.     Defendants knew that Jason Rivera had reasons to adopt Defendants' fabricated statement: Rivera's mother had a romantic connection to Defendant Guevara. Moreover, Defendants had leverage over Rivera because of his involvement in another murder case. At no point did Defendants disclose these facts about Jason Rivera to state prosecutors, Plaintiff, or criminal defense counsel.

6.     The other supposed eyewitness to the Hernandez shooting, David Velazquez, has repeatedly testified that Defendants forced him to implicate Plaintiff, using threats and coercion, and he has repeatedly disclaimed the false account that these Defendants attributed to him.

7.     To wrongly convict Plaintiff, Defendants also relied on an involuntary and false confession they extracted from Plaintiff after a physically and psychologically abusive interrogation, during which they beat Plaintiff and repeatedly threatened to harm his partner and children.

8.     Defendants' misconduct resulting in Plaintiff's wrongful conviction was just part of a now well-known pattern of illegal activity perpetrated by Defendant Guevara and the other Defendants.

9.      Plaintiff is one of at least 34 men and women who have had convictions on murder charges vacated after being framed in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

10.     The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

11.     Cook County courts have found that "Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

12.     In court proceedings, Defendants Guevara, Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers, and Defendants Guevara and Halvorsen have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct during the investigation of the Hernandez murder.

13.     Nearly 31 years after Plaintiff's terrible ordeal began, after Defendant Guevara's misconduct had come to light, Plaintiff was finally exonerated. His conviction was vacated and all charges against him were dropped.

14.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of their misconduct.

## JURISDICTION AND VENUE

15.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

16.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

18.     Plaintiff DANIEL RODRIGUEZ spent 17 years wrongfully incarcerated for a murder that he did not commit.

19.     At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Robert Biebel, Edward Mingey, Edward Strandburg, Louis Rabbit, Noel Caprousso, Steve Gawrys, , and other unknown law enforcement officers were Chicago Police officers, acting under color of law and within the scope of their employment. These Defendants are referred to collectively as the "Police Officer Defendants" throughout this complaint.

20.     Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, and Noel Caporusso, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen and Noel Caporusso, as successor in interest and to defend this action on behalf of Defendants Ernest Halvorsen and Noel Caporusso.

4

21. Janice Rabbit, the Special Representative for Louis Rabbit, deceased, is named as a Defendant in her capacity as Special Representative of Louis Rabbit, as successor in interest, and to defend this action on behalf of Defendant Louis Rabbit.

22. At all times relevant to the events described in this complaint, Robert Biebel, Edward Mingey, Lee Epplen, and other unknown law enforcement officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

23. At all relevant times, Defendant Patrick Walsh and unknown state prosecutors were Assistant Cook County State's Attorneys. Prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in his investigatory capacity, these Defendants manufactured and fabricated coerced confessions and statements from Plaintiff and other witnesses, and worked to maliciously prosecute Plaintiff for the Hernandez murder. These Defendants are referred to collectively as the "Prosecutor Defendants" throughout this complaint.

24. The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted during their investigation of the Hernandez murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

25. Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times

the employer of the Prosecutor Defendants. Defendant Cook County is a necessary party to this lawsuit.

26.    Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

27.     In the early morning hours of March 17, 1991, Jose Hernandez, Jr. (also known as Junito) was shot in the neck in his car near 4152 W. North Avenue.

28.     Mr. Hernandez crashed into a parked car, and he died from his injuries.

29.     At least one witness saw two cars head west on North Ave. from the scene of the shooting.

30.     None of the witnesses told police they had seen Mr. Hernandez's shooter. None provided a description of the drivers of the fleeing cars.

31.     Defendants' initial leads did not reveal any suspects.

### Jason Rivera Gets Involved In The Investigation

32.     On or around March 25, 1991, the week after the murder, Jason Rivera was preparing with Defendant Halvorsen to testify before a grand jury in another matter, *People v. Cortes*.

33.     According to the Police Officer Defendants, during this meeting Rivera made an "initial statement" to Halvorsen regarding Mr. Hernandez's murder.

34.     According to the Police Officer Defendants, Rivera's statement implicated Plaintiff and George Laureano in the crime.

35.     The Police Officer Defendants suppressed all records relating to this supposed initial statement. There is no record of this statement by Rivera in the police files for this case.

36.     The Police Officer Defendants used Rivera as a witness because they knew they could force him to implicate Plaintiff and Laureano.

37.     In particular, Rivera was not merely a witness in *Cortes*. Instead, he was an uncharged co-conspirator in the violent double murder at issue in that case. Rivera helped Cortes sell stolen goods he obtained from the robbery and murder of the victims, including facilitating the sale of the murder weapon. In fact, it was Rivera, not Cortes, who was responsible for the murders at issue in that case.

38.     At no point did the Police Officer Defendants disclose any of this information to Plaintiff or his counsel.

39.     Rivera's involvement in this separate murder and robbery case made him highly susceptible to the Police Officer Defendants' efforts to fabricate a false statement and evidence from Rivera implicating Laureano and Plaintiff.

40.     Separately, Rivera's mother, Alicia Velez (Rivera), was an employee of the Chicago Police Department.

41.     Velez was in a sexual relationship with Defendant Guevara at the time Rivera adopted the Police Officer Defendants' false statement as his own.

42.     The Police Officer Defendants did not disclose Rivera's or his mother's connection to Guevara at any point during the investigation or prosecution of Plaintiff's criminal case.

43.     Following Rivera's purported statement to Halvorsen about Plaintiff and Laureano's involvement in the Hernandez killing, Defendants Halvorsen and Guevera purportedly searched for Laureano and Plaintiff for five weeks without finding either of them.

**Defendants Concoct False Witness Identifications and False Witness Statements**

44.     On or around May 9, 1991, Defendants Guevara and Halvorsen showed Rivera a photograph of Plaintiff.

45.     The identification procedure was unduly suggestive and was designed solely to cause Rivera to identify Plaintiff and not to identify the perpetrator of the Hernandez shooting.

46.     As a result of being shown the photo, Rivera identified Plaintiff as one of the perpetrators of Hernandez's shooting.

47.     In addition, Rivera adopted a written statement authored by the Police Officer Defendants, in which Rivera claimed that he and his cousin David Velazquez had seen Laureano and Plaintiff drive up to Hernandez's car, and that Laureano had shot Hernandez.

48.     The next day, Defendants Halvorsen and Guevara fabricated a written statement implicating Plaintiff in the Hernandez murder, and they forced Velazquez to adopt it.

49.     Velazquez's account of the Hernandez shooting fabricated by the Police Officer Defendants was the same as Rivera's fabricated statement.

50.     Like Rivera's statement, the Police Officer Defendants knew that Velazquez's statement was false.

51.     Velazquez only signed off on it because he was fed facts, was coerced, and was threatened until he signed the statement.

52.     Among other things, to force Velazquez to sign the statement, Defendants Guevara and Halvorsen brought Velazquez to a rival gang's territory and announced that Velazquez had murdered one of that gang's members. Velazquez begged them to stop, and he agreed to do whatever Defendants wanted.

53.     Defendants Guevara and Halvorsen told Velazquez that they "knew" he had been with Rivera at the scene of the murder.

9

54. Defendants also instructed Rivera to pressure Velazquez to adopt the false statement implicating Laureano and Plaintiff, and Rivera told Velazquez he needed to "go with the program."

55. Velazquez has testified repeatedly that the statement the Police Officer Defendants attributed to him was false and that Defendants Guevara and Halvorsen used intimidation and threats to obtain his statement.

56. The Prosecutor Defendants were present while the interrogations of Rivera and Velazquez were ongoing and participated personally in the interrogations and fabricating their false statement that incriminated Plaintiff in the crime.

**Defendants Obtain Plaintiff's False Confession by Force**

57. After extracting a false statement from Velazquez, Defendant Halvorsen pulled Plaintiff over, held him at gunpoint, and arrested him.

58. Defendant Halvorsen told Plaintiff while arresting him words to the effect of "Guess what, Bart? You won the Junito murder."

59. Defendant Guevara then came to the scene of the arrest and brought Plaintiff back to Area Five.

60. At the time of his arrest, Plaintiff was familiar with Defendants Guevara's and Halvorsen's reputations in the neighborhood, and he knew that he should try to avoid them because if they wanted to get a person off the street, they would plant a case on that person.

61. Defendants Guevara and Halvorsen handcuffed Plaintiff to the wall of an interrogation room at Area Five and held him there for many hours.

62.     When Halvorsen and Guevara came into Plaintiff's interrogation room claiming they knew he had been involved in the murder, Plaintiff continually maintained his innocence and told them he knew nothing about the Hernandez shooting.

63.     During the interrogation, Plaintiff offered Defendants his alibi for the shooting. He has maintained that alibi to this day: At the time of the Hernandez murder, Plaintiff was at home with his partner (now wife), Gloria Rojas, watching movies. Plaintiff's girlfriend's sister, Serma, and his infant daughter were also present at the time.

64.     Gloria Rojas corroborated Rodriguez's alibi in her testimony at trial.

65.     Defendants Guevara and Halvorsen refused to accept the truth of Plaintiff's innocence.

66.     Defendants Halvorsen instead initiated a brutal interrogation of Plaintiff, during which Plaintiff was abused physically and psychologically.

67.     After Plaintiff said that he did not know anything about the murder, Defendants struck him multiple times in his chest, ribs, and stomach with a closed fist.

68.     They held him incommunicado for hours, with no chance to communicate with another person, or to consult with an attorney.

69.     Defendants returned to the room repeatedly and continued beating Plaintiff about his chest and ribs.

70.     They showed Plaintiff the statements from Rivera and Velazquez implicating Plaintiff and Laureano at that time.

71.     Throughout the interrogation, Defendants told Plaintiff that the police had been watching his home, and they threatened that the police could raid the house at any time and pin illegal items on Gloria Rojas, take their children, and put them in foster care.

11

72.     Plaintiff felt increasingly helpless and alone after numerous rounds of threats and violence against him perpetrated by Guevara and Halvorsen.

73.     Defendants told Plaintiff that if he cooperated, Plaintiff could return home immediately. Plaintiff's car keys were sitting on the table in front of him as Defendants offered this.

74.     After hours of detainment and interrogation, Plaintiff's will was overborne and Plaintiff provided the statement fed to him by Defendants, in which he confessed to picking up a gun with Laureano, and driving Laureano as he committed the shooting.

75.     Before he gave his statement, Halvorsen gave him a typed piece of paper that outlined what Plaintiff was meant to say in his statement.

76.     The Prosecutor Defendants were present while Plaintiff's interrogation was ongoing and participated personally in the interrogation and fabricating the false incriminating statement that Plaintiff was forced to sign.

77.     Plaintiff's statement coerced by violence and psychological coercion, and manufactured by Defendants, was used to prosecute and convict Plaintiff of a crime he did not commit.

**Rivera Recants Before Reversing Course**

78.     Laureano was arrested for the Hernandez murder on November 20, 1991.

79.     Once Laureano was in custody, Rivera identified Laureano as the shooter.

80.     In April 1992, Laureano's attorney, Lisa Brean, spoke with Rivera, with Jo-Ann Garcia present for the conversation.

12

81.     During this discussion, Rivera denied telling Defendants Guevara and Halvorsen that he witnessed Hernandez's murder, and he indicated that he had shown the officers documents confirming that he was locked up in Gateway at the time of the crime.

82.     Rivera told Brean and Garcia that Guevara and Halvorsen had shown him what they purported was Velazquez's statement during that meeting. The statement had no signatures. When Rivera questioned the lack of a signature, the detectives told him it did not matter.

83.     Rivera refused to attend Laureano's trial in September 1992 and was held in contempt of court.

84.     At Laureano's trial, Velazquez testified that Defendants Guevara and Halvorsen forced him to make a statement falsely implicating Plaintiff and Laureano.

85.     Based on Velazquez's recantation and Rivera's absence, Laureano was acquitted of Hernandez's murder via directed verdict.

86.     Defendants placed Rivera in witness protection immediately after his contempt hearing.

87.     Decades later, during post-conviction proceedings in other matters concerning Defendant Guevara's serial misconduct, the Cook County State's Attorney's Office disclosed that its relocation unit paid Rivera $1,350 in cash in March 1993 on the condition that he agreed to testify at Plaintiff's criminal trial. That payment was never previously disclosed.

88.     The State's Attorney's relocation unit paid Rivera an additional $1,000 in October 1993 as well. This payment was also never disclosed to Plaintiff or his counsel.

13

**Plaintiff's Wrongful Conviction and Imprisonment**

89.     As a result of Defendants' misconduct, Plaintiff was tried in the Circuit Court of Cook County.

90.     Plaintiff's criminal trial began in July 1993.

91.     The State's case hinged upon Rivera's fabricated statement and Plaintiff's false confession. At trial, the State presented no other eyewitness testimony outside of Rivera's falsified account of the shooting.

92.     There was no physical evidence of any kind linking Plaintiff to the crime.

93.     At Plaintiff's trial, Velazquez once again testified that he had not witnessed the shooting, and had only signed a statement implicating Laureano and Plaintiff because Defendant Guevara had threatened to pin a murder on him.

94.     Plaintiff said at trial that his statement was false, testified to his innocence, and presented his alibi to the court.

95.     Plaintiff told the court about the physical and psychological abuse Defendants Guevara and Halvorsen used against him to force him to confess. To support his claims, Plaintiff introduced photographs taken by another inmate while Plaintiff had been jailed showing faint bruising on his body from his interrogation.

96.     Both Gloria Rojas and Laureano substantiated Plaintiff's claims in their trial testimony.

97.     Rivera provided false testimony repeating the same story he told in his written statement.

98.     Without Plaintiff's false confession and Rivera's fabricated statement, Plaintiff would never have been convicted.

99.     A judge found Plaintiff guilty of first-degree murder. He was sentenced to decades in prison.

100.    Plaintiff was only 21 years old at the time of his arrest. The following decades of his life were consumed by the horror of his wrongful imprisonment.

101.    Because of the Defendants' misconduct, Plaintiff's opportunity to know his family and make a life with them was taken away. He lost decades of time where he was not with his wife, and he missed out on the opportunity to raise his two children. Plaintiff's relationships with his wife, children, and the rest of his family were extraordinarily harmed.

102.    Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

103.    Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

104.    Plaintiff spent decades in prison before being released.

105.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

106.    Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

15

**Plaintiff's Exoneration**

107.    Velazquez testified in multiple post-conviction hearings instituted by petitioners who were victims of Guevara's misconduct. Velazquez's testimony in these post-conviction hearings was consistent with what he had said in Laureano and Rodriguez's trials.

108.    Rivera returned to testify in two post-conviction proceedings in *People v. Reyes & Solache* only after the State's Attorney paid him an additional $1,750. He repeated his false testimony from Rodriguez's original criminal trial.

109.    At the end of the post-conviction proceedings in *People v. Reyes & Solache*, Cook County Judge Obbish found Velazquez's testimony about his experiences with Defendants Guevara and Halvorsen credible. Both Reyes's and Solache's convictions were vacated.

110.    In 2016, Laureano testified at the post-conviction evidentiary hearing held in *People v. Almodovar & Negron*. Laureano reiterated that neither he nor Plaintiff had anything to do with Hernandez's murder.

111.    Rivera testified in the same proceedings. He received a total of $2,750 from the State's Attorney's office for so-called rent and moving expenses. But Rivera did not move at any point in time close to the post-conviction proceedings, and he instead pocketed the money.

112.    In April of 2018, in depositions in *Montanez v. Guevara, et al.*, both Defendant Guevara and Defendant Halvorsen pled the Fifth Amendment in response to all questions regarding their investigation of the Hernandez shooting.

113.    Velazquez submitted a sworn affidavit in 2020 maintaining his testimony that Defendants Guevara and Halvorsen forced him to adopt their false statement implicating Plaintiff and Laureano.

114.     In October 2020, Plaintiff filed a Petition for Relief from Judgment. The State withdrew its opposition to Plaintiff's petition in April 2022.

115.     In April 2022, Judge Atcherson of the Cook County Circuit Court vacated Plaintiff's conviction. The State entered a motion of *nolle prosequi* on the remaining count against Plaintiff and dismissed all charges against him.

116.     At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half his life.

### Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution

117.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

118.     Since 1986, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

119.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including concealing exculpatory evidence, coercing confessions through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

120.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

121.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information, including evidence of a police report indicating the identification of a perpetrator in a different lineup. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

122.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

123.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

124.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Hernandez murder and investigation at issue here.

125.     In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

18

126.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation into the Hernandez murder.

127.    In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

128.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

129.    Prior to and during the period in which Plaintiff was falsely charged with and convicted of the Hernandez murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

130.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by Charlie Beck, the interim superintendent of the CPD. In

19

accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

131.    As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

132.    This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulating eyewitness identification as well as fabricating and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and other Chicago police officers engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

133.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful charging and conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.    The conduct of live lineup, photographic, and other identification procedures.

b.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.      The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.      The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.      The risks of engaging in tunnel vision during investigation.

f.      The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

134.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

135.    The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

136.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful

21

practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

137.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

138.    As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

139.    As of the filing of this complaint, 34 men and women have had their convictions thrown out as a result of Defendant Guevara's misconduct. Those men served hundreds of years in prison for crimes they did not commit. In addition to Plaintiff, the 33 others are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Gabriel Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Colon, David Lugo, Carlos Andino, Alfred Gonzalez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, and Johnny Flores.

140.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, and coercing false confessions and false statements from suspects and

witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

141.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

142.    Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. These allegations include the manipulation of dozens of witnesses to provide false identifications, as well as every single instance of misconduct detailed below.

143.    A few examples of Defendant Guevara's misconduct include:

a.    Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him."  The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant

Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.    Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.    In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d.    In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

24

e.      Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.      In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.      Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.      After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Defendant Gawrys, and his supervisor Ed Mingey.

i.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false
    identification by repeatedly threatening Muniz, saying that if Muniz did not
    identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to
    Virgilio Muniz, described in the above paragraph) into making a false
    identification by telling him who to identify and making a veiled threat as to what
    would happen if he did not comply.

k.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false
    identification and giving false testimony before the grand jury. Guevara
    threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario
    would be "pinned" for the murder. Guevara fed Rosario details of the crime, such
    as the number of shots fired, the type of vehicle used in the crime, and the
    participants in the crime. Rosario recanted his identification of Arcos at trial.
    Though Arcos was still found guilty of murder by a jury, the appellate court
    overturned the conviction based on the lack of sufficient evidence.

l.  In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon
    out of a lineup. As a result, these men falsely accused Colon of committing a
    murder, but later came forward to recant and shed light on Defendant Guevara's
    misconduct.

m.  In 1993, Defendant Guevara coerced an identification from Carl Richmond with
    threats, saying that he could make Richmond's life very uncomfortable if
    Richmond did not identify Robert Bouto as the murderer of one of Richmond's

friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

n.  In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o.  In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p.  In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q.  In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r. In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

s. In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

t. In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

u. In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found

28

Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

v.   In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

w.   In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

x.   In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

y.   In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

29

z.    In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

aa.    In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb.    In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc.    In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint

with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd.     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he

confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg.     In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

hh.     In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

ii.     In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

jj.     In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room,

Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk.   In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll.   In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm.   In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour

33

interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

nn.   In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo.   In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp.   In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq.   In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that

34

Guevara *never* took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr.    In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt.    In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

uu.    In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

vv.    In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had

35

identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

144.     Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

145.     In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

146.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

147.     As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

148.     In the manner described more fully above, Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

149.     Defendants knew this evidence was false.

150.     Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

151.     Defendants procured supposed eyewitness identifications of Plaintiff, which they knew to be false and unreliable, using unduly suggestive procedures. Despite this, Defendants caused these identifications to be used during Plaintiff's criminal trial.

152.     In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

153.     In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

154.     The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

155.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

156.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

157.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II
### 42 U.S.C. § 1983 – Coerced and False Confession
### (Fifth and Fourteenth Amendments)

158.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

159.    In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

160.    In addition, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

161.    In addition, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well

as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

162.    Specifically, Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself in the murder of Jose Hernandez, Jr.

163.    Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Hernandez murder.

164.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

165.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

166.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT III
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

167.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

168.     In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

169.     In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

170.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

171.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

172.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT IV
### 42 U.S.C. § 1983 – Failure to Intervene

173.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

174.     In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants and the Prosecutor Defendants stood by

without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

175.    These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

176.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

177.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

178.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V
## 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

179.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

180.    In the manner described more fully above, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Hernandez shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

181.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

41

182.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

183.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

184.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

185.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

186.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

187.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

188.    At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of

42

investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

189.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

190.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

191.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers

and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

192. In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

193. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

194. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together,

because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

195.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

196.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

197.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VII**
**State Law Claim – Malicious Prosecution**

198.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

199.     In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

200.     In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

201.     The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in April 2022.

202.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

203.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
## State Law Claim – Intentional Infliction of Emotional Distress

204.  Plaintiff incorporates each paragraph of this complaint as if fully restated here.

205.  The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

206.  As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim – Willful and Wanton Conduct

207.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

208.     At all times relevant to this complaint the Police Officer Defendants and the Prosecutor Defendants had a duty to refrain from willful and wanton conduct in connection with the Hernandez murder investigation.

209.     Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

210.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – Civil Conspiracy

211.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

212.     As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

213.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

214.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

215.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

216.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
### State Law Claim – *Respondeat Superior*

217.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

218.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

219.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
### State Law Claim - Indemnification

220.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

221.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

222.    The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

223.    Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants.

224. The Prosecutor Defendants were employees, members, and agents of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

225. Defendant Cook County is responsible to pay any judgment entered against the Prosecutor Defendants.

WHEREFORE, Plaintiff DANIEL RODRIGUEZ, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, GERI LYNN YANOW as special representative of the ESTATE OF ERNEST HALVORSEN, ROBERT BIEBEL, EDWARD MINGEY, LEE EPPLEN, EDWARD STRANDBURG, JANICE RABBIT as special representative of the ESTATE OF LOUIS RABBIT, GERI LYNN YANOW as special representative of the ESTATE OF NOEL CAPORUSSO, STEVE GAWRYS, the CITY OF CHICAGO, PATRICK WALSH, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, DANIEL RODRIGUEZ, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**DANIEL RODRIGUEZ**

BY:     s/ Steve Art

*One of Plaintiff's Attorneys*