# Exhibit 45

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CARL CHATMAN<br><br>Plaintiff,<br><br>v.<br><br>City of Chicago, Chicago Police Detective John Roberts, Chicago Police Detective Thomas McGreal, Chicago Police Detective Maria Pena, Chicago Police Detective Jack Boock, Chicago Police Detective Rita Mischka, Chicago Police Detective Barbara Midona, Chicago Police Sergeant Dennis Walsh, Chicago Police Officer Michael Karczewski, Chicago Police Officer Richard Griffin, Chicago Police Lieutenant Joseph Joria, Chicago Police Sergeant Bryan Holy, Cook County Sheriff's Deputy Michael Cokeley, Cook County Sheriff's Deputy Joseph Prince, Cook County Sheriff's Deputy Sergeant Maria Mokstad, Cook County Sheriff's Deputy Lieutenant Burrough Cartrette, Assistant State's Attorney Brian Holmes and unknown Chicago Police Officers and unknown Cook County Sheriff's Deputies, the County of Cook, Thomas Dart, in his official capacity as Sheriff of Cook County, and Anita Alvarez, in her official capacity as Cook County State's Attorney, and Susan Riggio,<br><br>Defendants. | **JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiff, CARL CHATMAN, by his attorneys, Loevy & Loevy, for his complaint against the Defendants, City of Chicago, Chicago Police Detective John Roberts, Chicago Police Detective Thomas McGreal, Chicago Police Detective Maria Pena, Chicago Police Detective Jack Boock, Chicago Police Detective Rita Mischka, Chicago Police Detective Barbara Midona, Chicago Police Sergeant Dennis Walsh, Chicago Police Officer Michael Karczewski, Chicago Police Officer Richard Griffin, Chicago Police Lieutenant Joseph Joria, Chicago Police Sergeant Bryan Holy, and unknown Chicago Police Officers, along with the County of Cook, Assistant State's Attorney Brian Holmes, Cook County Sheriff's Deputy Michael Cokeley, Cook County Sheriff's Deputy Joseph Prince, Cook County Sheriff's Deputy Sergeant Maria Mokstad, Cook County Sheriff's Deputy Lieutenant Burrough Cartrette, unknown Cook County Sheriff's Deputies, Thomas Dart in his official capacity as Sheriff of Cook County, and Anita Alvarez in her official capacity as Cook County State's Attorney; together with Susan Riggio, states as follows:

## Introduction

1. Carl Chatman spent more than eleven years in prison for a rape he did not commit.

2. Not only did Mr. Chatman not commit the rape for which he was wrongfully convicted, but the rape never even occurred at all. The purported victim made up an account of having been raped in Chicago's Daley Center so that she could bring a law suit for money damage against the company responsible for the building's security.

3. This marked the second time this same woman had fabricated rape charges in order to bring a legal action against a building security company for illicit financial gain.

4. After the purported rape victim made up the story of having been attacked in the Daley Center, the Defendants proceeded to "solve" the crime. Specifically, in their zealousness to obtain a swift conviction in a high-profile case, the Defendant Chicago Police Officers took advantage of Mr. Chatman's mental instability and coerced him to falsely confess to a crime that never actually happened.

5. In this way, and based on the resulting false "confession," these Defendants caused Mr. Chatman to be wrongfully convicted to a crime that never even occurred.

6. The State of Illinois eventually came to recognize that Mr. Chatman's confession was false, and that his conviction was wrongful. In September 2013, the Cook County State's Attorney's Office voluntarily dismissed all charges against Mr.

Chatman, and the State of Illinois granted Mr. Chatman a Certificate of Innocence.

7. Mr. Chatman's exoneration came after he spent over eleven years as an innocent man in prison. Given his mental state, Mr. Chatman was particularly vulnerable to the worst elements of prison, and his experience there was devastating to his emotional health.

8. Through this lawsuit, Mr. Chatman seeks accountability and compensation for losing more than a decade of his life due to Defendants' misconduct.

**Jurisdiction and Venue**

9. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

10. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. 1331 and state law claims pursuant to 28 U.S.C. 1367.

11. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

12. Plaintiff Carl Chatman is 59 years old. He is a veteran of the United States Army.

13. Defendant Susan Riggio is a resident of Illinois.

14. At all relevant times, Defendants John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, Barbara Midona, Michael Karczewski, Richard Griffin, Sergeant Dennis Walsh, Lieutenant Joseph Joria, Sergeant Bryan Holy, and unknown Chicago police officers were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under color of law.

15. At all relevant times, Defendants Michael Cokeley, Joseph Prince, Sergeant Maria Mokstad, Lt. Burrough Cartrette, and unknown Deputies of the Cook County Sheriff's Department were Deputies employed by the Cook County Sheriff and acting within the scope of their employment and under color of law.

16. At all relevant times, Defendant Brian Holmes was an Assistant State's Attorney employed by the Cook County State's Attorney's Office and acting within the scope of his employment and under color of law.

17. Defendants John Roberts, Thomas McGreal, Maria Pena, Jack Boock, Rita Mischka, Barbara Midona, Michael Karczewski, Richard Griffin, Sergeant Dennis Walsh, Sergeant Bryan Holy,

Lieutenant Joseph Joria, Michael Cokeley, Joseph Prince, Sergeant Maria Mokstad, Lt. Burrough Cartrette, unknown Chicago police officers and unknown Deputies of the Cook County Sheriff's Department are referred to collectively as the "Law Enforcement Defendants."

18. The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

19. Defendant Thomas Dart is the current Sheriff of Cook County, Illinois. He is sued in his official capacity.

20. Defendant Anita Alvarez is the current State's Attorney for Cook County, Illinois. She is sued in her official capacity.

21. Defendant Cook County is a county of the State of Illinois. Cook County is obligated by Illinois statute to pay any judgment entered against Defendant Dart or Defendant Alvarez in their official capacities.

**Factual Background**

22. Carl Chatman was born in 1954 and grew up in Chicago with his two sisters and brother.

23. At the age of 20, Mr. Chatman married and enlisted in the military. At the conclusion of his military service, Mr. Chatman returned to Chicago, where he and his wife had a son.

24. By the turn of the new millennium, Mr. Chatman had

fallen on hard times. He was an easily confused and extremely vulnerable man.

**Defendant Riggio Targets Mr. Chatman**

25. During the week of May 20, 2002, Mr. Chatman went to the Daley Center to investigate how to file a small claims suit.

26. At the Daley Center, Mr. Chatman eventually made his way to the 21st floor.

27. At the time, Defendant Susan Riggio, age 50 at the time, worked as a scheduling clerk for Judge Bartkowicz, who sat in courtroom 2101 at the Daley Center.

28. By happenstance, Mr. Chatman entered Judge Bartkowicz's courtroom looking for assistance. There, he encountered Defendant Riggio.

29. After a very brief interaction, Mr. Chatman left without incident. At the time, he was wearing a Blackhawks jacket and street clothes.

30. Based on this encounter, Defendant Riggio knew what Mr. Chatman looked like, and also knew that he was a defenseless and guileless individual, who would not fare well if falsely accused. He was, in short, the perfect target for her plan.

**Riggio's Plan**

31. Shortly before May 20, 2002, Defendant Riggio had received notice from the IRS that she was to be audited for her

prior tax filings.

32. At the time, Defendant Riggio was also under severe financial pressures. She and her husband had been gambling heavily, and had experienced over $500,000 in losses in the year 2000 alone. Defendant Riggio was also intent on divorcing her husband.

33. Faced with these financial pressures, Defendant Riggio concocted a plan to falsely claim that she had been raped inside the Daley Center, thereby enabling her to sue various entities responsible for the Daley Center's security.

34. Defendant Riggio had engaged in the exact same scheme some 20 years earlier. In 1979, facing different financial pressures, Defendant Riggio falsely claimed that she was raped inside a downtown office building in the early morning hours, before anyone else had arrived to work. Defendant Riggio then sued the building's management and received a cash settlement.

35. Having succeeded in the 1970s with a bogus civil suit against a building manager based on a false accusation of rape, Defendant Riggio decided to pull the same scam all over again. This time, Mr. Chatman was her victim.

**The False Allegation**

36. On May 24, 2002, Defendant Riggio went to work very early. Although not scheduled to work until 8:30 a.m., she

arrived at the Daley Center at 7 a.m., long before any of her co-workers arrived. She did so notwithstanding that it was the Friday before the Memorial Day weekend holiday, and the judge for whom she worked was out of town.

37. Defendant Riggio claimed that at approximately 7:20 a.m., while she was alone in her office behind courtroom 2101, Mr. Chatman appeared with his penis exposed and said words to the effect of, "the judge fucked me and now I'm going to fuck you, bitch."

38. According to Defendant Riggio, she fought with her attacker, screaming for help, and was then raped in her vagina and anus. She claimed that during the altercation, she fought for her life with her attacker and had her head beaten against a table and scissors held to her throat.

39. When one of Defendant Riggio's co-workers, Jeannette Neibauer, arrived for work, Riggio told her about the alleged attack, whereupon Neibauer called the police.

40. When the police officers arrived, Defendant Riggio falsely claimed that Mr. Chatman was the man who raped her, and provided the responding officers with a description of an African American man in the Blackhawks jacket (Mr. Chatman) who had been seen on her floor earlier in the week.

**Mr. Chatman's Arrest**

41. Shortly after Defendant Riggio reported the crime, a flash message went out to members of the police department, alerting them to look for a potential suspect in the Loop area described as a black male with salt and pepper hair wearing a Blackhawks jacket.

42. Before long, Mr. Chatman was located walking around the downtown area wearing his Blackhawks jacket. He is African American and had salt and pepper hair.

43. After finding him, Officers arrested Mr. Chatman at approximately 8:30 a.m.

44. At the time he was arrested, Defendant Officers Griffin and Karczewski falsely claimed that Mr. Chatman said he was coming from the Daley Center. This allegation was false. Mr. Chatman was not at the Daley Center on the morning of the 24th, and he did not claim that he was.

**Mr. Chatman's Vulnerabilities**

45. When not properly medicated, Mr. Chatman suffers from a mental illness that interferes with his ability to function properly. He experiences disorganized thoughts, pressured speech, and an inability to think in a linear or logical matter at times.

46. At the time of his interrogation sessions with the

various Defendants, Mr. Chatman was having difficulty communicating in a logical and linear fashion due to his then-existing mental condition.

47. As a result of Mr. Chatman's inability to communicate in a normal manner, it was immediately obvious to any person who questioned Mr. Chatman at any point on May 24 or May 25, 2002, that he was suffering from cognitive deficiencies and symptoms of unmedicated mental illness.

**Mr. Chatman's False "Confession"**

48. Following his 8:30 a.m. arrest, Mr. Chatman was brought to Area 4 Detective Headquarters and questioned by Defendant Detectives Mischka and Boock.

49. Mr. Chatman had never in his life previously been accused of a crime involving violence, and has never committed one.

50. During his interrogation by Defendants Mischka and Boock, Mr. Chatman initially maintained his innocence and did not implicate himself.

51. At approximately 10:30 p.m., Defendant Detective Roberts began interrogating Mr. Chatman.

52. When Defendant Roberts began his interrogation, the pressure to obtain a confession from Mr. Chatman was mounting. Per her plan, Defendant Riggio publicized the (false) attack.

The rape of a woman inside the Daley Center in the heart of the Loop had by then generated a tremendous amount of media attention. There existed a belief among each of Defendants Roberts, Holmes, Mischka, Boock, Midona, and Walsh that getting Mr. Chatman to confess was the surest way to obtain a speedy resolution.

53. During the interrogation, Defendant Roberts used force and threats of force to coerce Mr. Chatman to confess.

54. Before Mr. Chatman confessed, Defendants ASA Holmes, Detective Midona, and Sergeant Walsh joined Defendant Roberts in his interrogation of Mr. Chatman.

55. Defendants Roberts, Holmes, Midona, and Walsh observed Mr. Chatman's obvious cognitive deficiencies and symptoms of mental illness. Rather than take steps to ensure Mr. Chatman was truly and freely agreeing to confess, these Defendants took advantage of his diminished capacity and mental vulnerabilities, and continued their interrogation in a manner intended to force Mr. Chatman to falsely confess.

56. Eventually, Defendants Roberts, Holmes, Mischka, Boock, Midona, and Walsh overcame Mr. Chatman's will through improper means, and thereby succeeded in coercing him to sign a false confession to the alleged rape.

57. Mr. Chatman's resulting confession included various

Case: 1:14-cv-02945 Document #: 1 Filed: 04/24/14 Page 13 of 48 PageID #:13

factual details that could only have been known by someone who committed the crime, had it actually occurred, or by someone with access to the police reports describing the alleged crime.

58. Mr. Chatman had no personal knowledge of the facts and circumstances surrounding the alleged rape contained in his confession. Instead, Mr. Chatman was fed details of the crime by Defendants Roberts, Holmes, Mischka, Boock, Midona, and Walsh. Being totally innocent, and having no knowledge of Defendant Riggio's allegations, Mr. Chatman could not have provided the information contained in his confession without those Defendants having provided this information to him during the course of his interrogation.

59. Not only did the Defendants feed Mr. Chatman all of the details of the alleged crime, but Defendants Holmes, Roberts, Midona, and Walsh walked Mr. Chatman through the crime scene to ensure that he had first-hand knowledge of the crime scene. These Defendants were subjectively aware that Mr. Chatman had no information about the alleged rape, and they walked him through the crime scene in order to provide him with the relevant facts and circumstances to bolster his "confession."

**The Forensic Evidence**

60. Not only did Mr. Chatman not commit the crime to which he "confessed," but there is no physical evidence to corroborate

his supposed confession, or even the rape itself.

61. For example, Defendant Riggio claimed to have been badly beaten by Mr. Chatman during what she claimed was a vaginal and anal rape. However, the thorough medical examination that Defendant Riggio underwent immediately after the alleged assault revealed no tears, scrapes, bleeding, bruises, cuts, lacerations, abrasions, or other injuries to her body, genitals, or rectum.

62. Defendant Riggio's clothing and swabs taken from her body were subjected to clinical scrutiny, including DNA testing. Neither Mr. Chatman's semen, hair, nor any other genetic material from Mr. Chatman (nor anyone else, for that matter) was found on Defendant Riggio's vagina, rectum, other body parts, or clothing.

63. Mr. Chatman's clothing was also collected shortly after the alleged assault and analyzed by forensic scientists, including by subjecting it to DNA testing. Despite an exhaustive search, Defendant Riggio's genetic material was not found anywhere on Mr. Chatman's body or clothing.

64. Defendant Riggio also claimed to have urinated on Mr. Chatman and bit him on the left shoulder of his coat, and a pool of urine was discovered at the crime scene. Extensive DNA testing revealed that none of Defendant Riggio's urine or saliva

appeared anywhere on Mr. Chatman's clothing.

65. Mr. Chatman's fingerprints were not found anywhere at the scene, even on the items the attacker allegedly touched, such as the scissors allegedly held to Riggio's neck.

66. In sum, none of the forensic testing linked Mr. Chatman to the alleged sexual assault. None of the forensic testing suggested that a sexual assault occurred at all.

**Mr. Chatman's Impossible "Escape"**

67. Defendant Riggio claimed that her sexual assault occurred at approximately 7:20 a.m. According to Riggio, the entire incident, beginning when Chatman appeared at her office door, lasted seven minutes.

68. As stated above, Defendant Riggio told one of her co-workers, Jeannette Neibauer, about the alleged attack when Neibauer arrived at work. Neibauer, who did not see Mr. Chatman, reported Defendant Riggio's purported attack to the authorities at 7:37 a.m., some ten minutes after it supposedly ended.

69. By 7:41 a.m., the Sheriff's Department locked down the entire building, notifying all security posts to close the building and prevent anyone from entering or exiting.

70. The Sheriff's Department and a private security company then conducted a floor-by-floor search for Defendant Riggio's alleged attacker.

71. The search failed to locate anyone. More specifically, Mr. Chatman was not seen anywhere inside the building, nor leaving it.

72. The fact that Mr. Chatman was never found in or leaving the building is particularly noteworthy. The Daley Center was closed to the public before 8 a.m. At the time Defendant Riggio claimed to be attacked, only authorized court personnel were allowed in the building. Moreover, there were very few people using the entrances or exits early that morning, which was the Friday before Memorial Day weekend.

73. Any person attempting to enter or leave the Daley Center during this time period would have been observed. Between 7 a.m. and 8 a.m., every exit from the Daley Center was guarded by at least one Sheriff's deputy, and video cameras were stationed to record the exits.

74. Neither Mr. Chatman nor anyone fitting his description appeared on security video taken of the Daley Center exits between 6:30 and 8:20 a.m. on May 24, 2002. Not one of the ten deputy sheriffs at the six doors exiting the Daley Center between 7:00 and 8:00 a.m. saw Mr. Chatman leaving the building or anywhere near the building.

**Riggio's 1979 Allegations Against Edward Szymczak**

75. As previously stated, Mr. Chatman's case was not the

first time that Defendant Riggio claimed that she had been raped early in the morning in a large office building. Unbeknownst to investigators on May 24, 2002, Defendant Riggio had made identical allegations against another innocent man 20 years before.

76. On October 23, 1979, Defendant Riggio claimed that she was raped at her workplace.

77. In that alleged 1979 attack, as in the new one, Defendant Riggio claimed that she arrived to work in the early morning hours when none of her co-workers were present to witness the events at a downtown office building. In the 1979 version, Defendant Riggio said she arrived between 6:45 and 7:00 a.m., whereupon one of the building's janitors, Edward Szymczak, supposedly showed her a knife, pushed her into the bathroom, and attacked her.

78. Defendant Riggio claimed that Szymczak repeatedly asked her name and told her to look at him, told her to remove her clothing, and eventually sexually assaulted her. Defendant Riggio said that she and Szymczak struggled before the rape. Defendant Riggio further claimed that Szymczak kept asking her name and told her to be quiet as he raped her. When the assault ended, Defendant Riggio claimed that Szymczak told her to stay in the bathroom, and he left, presumably to go back to work.

79. Defendant Riggio claimed her alleged attacker spoke to her in English, and she did not recall him having an accent.

80. Unbeknownst to Defendant Riggio, however, Szymczak was a Polish immigrant who spoke no English and needed a Polish translator for police interviews and later court proceedings.

81. Based on Defendant Riggio's allegations, Szymczak was charged with rape and unlawful restraint. He maintained his innocence, insisting that he had nothing to do with Defendant Riggio, and had raped no one.

82. Defendant Riggio retained legal counsel by November 6, 1979, less than two weeks after accusing Szymczak. She proceeded to file a civil suit based on her allegations against Szymczak, seeking in excess of four million dollars in damages. Her lawsuit named as defendants the office building owners, the building management company, the contracted janitorial service, the contracted security company, and others.

83. In connection with the civil lawsuit Defendant Riggio filed against the building and its security company arising out of her allegations about the purported Szymczak rape, Defendant Riggio ultimately settled her case and received a cash payment.

84. Due to the false accusations against him, Szymczak fled to Poland and was never tried. After Defendant Riggio filed her high-profile law suit, Szymczak sent a letter to the court

Case: 1:14-cv-02945 Document #: 1 Filed: 04/24/14 Page 19 of 48 PageID #:19

proclaiming his innocence. The English translation of the letter reads:

> To the Court of the State of Illinois:
>
> I have been charged with raping citizen Susan, without any evidence or basis for such accusation. I did not even know her. Because I have been in the United States for only a short period of time and do not have money for an attorney, I am forced to leave the country. I am very sorry to do that. Please forward this letter to citizen Susan, so she may once more think about what she is doing. If someone did rape her, they should be convicted and sentenced. However, if she has only made this whole thing up to make some money, she should earn money honestly and not like this. She should know that she will answer to God for her actions. I also ask that this Court not let this incident constitute a black mark on the record of my stay in the United States and on my life.
>
> Sincerely,
>
> Edward Szymczak

85. People who knew and worked with Szymczak were shocked by the allegations against him; by all accounts, he was an excellent employee who worked well with others and had no reputation for behaving violently, abusively, or inappropriately toward women or other people. Indeed, Szymczak's employer, Millard Maintenance, sent the following letter to the Polish Consulate and the ACLU asking for assistance with exonerating Szymczak:

> Can you be of assistance to a[n] employee of ours, who is [a] Polish immigrant, limited English, excellent work record, was switched to a different location, 625 N.

> Michigan, and is being accused of rape. He cannot shoulder the financial payment of $6000 legal. The company is not in a position to defend him. We feel it is a bum rap. What are his alternatives.

86. Like Mr. Chatman, Szymczak's life has been devastated by Defendant Riggio's false accusation of rape. Not only was he forced to abandon his dream of working hard to make a life for himself and his family in the United States, but he lives the rest of his days under a cloud of Defendant Riggio's false accusations.

**Riggio's Financial Motivations in 2002**

87. Before Defendant Riggio made her allegations against Mr. Chatman, she had again begun experiencing serious financial problems.

88. Specifically, on April 29, 2002, less than one month before her allegations against Mr. Chatman, Defendant Riggio and her husband received a letter from the United States Internal Revenue Service ("IRS"), notifying them that their tax return for tax year 2000 was being audited.

89. The IRS audit frightened Defendant Riggio and her husband; together, they had nearly $550,000 in gambling winnings in 2000, which they had failed to report on their tax return (and which they subsequently lost through even more gambling).

90. Less than one month after Defendant Riggio received

notification that the IRS would audit her tax return, Defendant Riggio claimed that she was attacked in the Daley Center. In her lawsuit filed just after the claimed attack, Defendant Riggio falsely inflated her damages.

91. When Defendant Riggio was first examined by a doctor on May 24, 2002, she had no evidence of injury anywhere on her body.

92. Four years later, however, at a deposition in the civil litigation, Defendant Riggio claimed to have sustained serious injuries as a result of Chatman's alleged sexual assault, including permanent damage to her internal and external genitalia, which caused her genitals to hurt and to feel "dead" and numb.

93. Defendant Riggio further claimed she suffered ongoing damage to her groin muscle, broken teeth, and scarring to her hip. None of these alleged injuries were noted in any of Defendant Riggio's medical visits in the months following the alleged assault.

94. As of 2006, Defendant Riggio claimed that she was no longer able to work for a living because she was unable to perform any job as a result of her claimed sexual assault.

95. This was not the first time that Defendant Riggio exaggerated her injuries in a lawsuit, just as this was not the

first time that Defendant Riggio had falsely claimed rape and sued. In 1989, Defendant Riggio was in a car accident. In the subsequent legal action, she claimed that she contracted Parkinson's disease as a result of the impact.

96. Miraculously, Defendant Riggio's Parkinson's disease somehow cured itself in the intervening years, to the point where she no longer requires any treatment for it.

**Defendants' Additional Misconduct**

97. Although Defendant Riggio set the ball in motion, Mr. Chatman's wrongful conviction could not have occurred without the other Defendants' malfeasance.

98. The Law Enforcement Defendants committed one or more of the following types of misconduct: coercing a false confession from Mr. Chatman; withholding material exculpatory evidence from Mr. Chatman; destroying exculpatory evidence; and fabricating inculpatory evidence that was used to help convict Mr. Chatman.

99. As stated above, Mr. Chatman was coerced to falsely confess to a crime he did not commit by Defendants Holmes, Walsh, Boock, Roberts, Mischka, and Midona. According to these Defendants, Mr. Chatman freely confessed in detail to a violent rape that he did not commit.

100. What makes these Defendants' misconduct even more

Case: 1:14-cv-02945 Document #: 1 Filed: 04/24/14 Page 23 of 48 PageID #:23

egregious is that they took advantage of a mentally-compromised and damaged individual in the process. Although civilian witnesses who interacted with Mr. Chatman even for brief periods of time during the week of May 20, 2002, described him as "incoherent," the Law Enforcement Defendants concealed any suggestion of Mr. Chatman's cognitive deficits from their reports.

101. Rather, Defendants Roberts and Holmes both maintained that they had absolutely no difficulty in understanding Mr. Chatman and that he had no problems communicating with them. These representations were totally false.

102. Upon being admitted to the Cook County Jail, Mr. Chatman was given a five-minute screening of his physical and mental health, during which intake personnel immediately perceived that something was seriously wrong with Mr. Chatman, who was promptly admitted to the acute care unit of the Jail. Detainees are placed in the acute care unit only if they are expressing mental health symptoms that require 24-hour psychiatric care.

**Further Withholding Of Exculpatory Evidence**

103. Due to Defendants' misconduct, Mr. Chatman was deprived of crucial evidence that could have avoided his wrongful conviction, including but not limited to the existence

of a witness who could testify the rape never occurred, and certainly not in the manner Defendant Riggio claimed.

104. In particular Defendant Riggio claimed that she engaged in an all-out fight for her life, screaming at least three times for a deputy to come to her assistance.

105. When responding officers, including Defendants Deputy Sergeant Maria Mokstad, Deputy Joseph Prince, and Deputy Michael Cokeley, arrived at the crime scene, it turned out by chance that a building employee, Cook County Sheriff's Deputy Michael Copeland, was fast asleep in the room directly next door to the crime scene with his shirt off.

106. Despite having been in the room next door to the alleged attack, Copeland told the responding officers that he heard no sign of any struggle whatsoever. In fact, the first indication Deputy Copeland had that something was amiss was when he heard the radios of other officers responding to a 911 call about the supposed attack, well after the "attack" ended.

107. On the morning of May 24, 2002, Defendants Cokeley, Prince, Mokstad, and Deputy Lieutenant Cartrette all knew that Deputy Copeland had been sleeping in the room next door to where Defendant Riggio claimed to have been attacked.

108. Indeed, that same morning, Defendant Cartrette had Deputy Copeland handwrite a statement acknowledging that he was

sleeping in room 2103A, next door to room 2101A, and that he heard nothing until officers began responding to the allegation that Defendant Riggio had been assaulted.

109. Defendant Detectives McGreal and Pena interviewed Defendants Cokeley, Prince, Mokstad, and Cartrette on May 24, 2002. Although each of these Defendants learned that Deputy Copeland knew information that would exculpate Mr. Chatman, these Defendants hid that information from the criminal justice system and, as a result, from Mr. Chatman.

110. In particular, there is no mention of Deputy Copeland's existence, let alone his nearby presence at the time of the alleged attack, in any of the police reports tendered to Mr. Chatman or his criminal defense counsel. Nor was there any way for Mr. Chatman to discover this information once it was hidden from him by these Defendants.

111. Specifically, Defendant Cokeley communicated to Defendant McGreal that he had seen Deputy Copeland sleeping in the room next to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

112. Pleading in the alternative, Defendant Cokeley did not tell Defendant McGreal the information referenced in the preceding paragraph, and instead intentionally suppressed it.

113. Defendant Prince communicated to Defendant Pena that he had seen Deputy Copeland sleeping in the room next to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

114. Pleading in the alternative, Defendant Prince did not tell Defendant Pena the information referenced in the preceding paragraph, and instead intentionally suppressed it.

115. Defendant Mokstad communicated to Defendant Pena that he had seen Deputy Copeland sleeping in the room next to where the crime alleged took place, and Defendant McGreal proceeded to withhold that information from the criminal prosecutors and Mr. Chatman's defense.

116. Pleading in the alternative, Defendant Mokstad did not tell Defendant Pena the information referenced in the preceding paragraph, and instead intentionally suppressed it.

117. Mr. Chatman lost over a decade of his life before he was finally exonerated. During that time, his wife divorced him, family members died, and Mr. Chatman was falsely branded a rapist and incarcerated alongside some of the most dangerous prisoners in our penal system.

118. Mr. Chatman now seeks to vindicate his rights by holding those responsible for his injuries accountable for their

Case: 1:14-cv-02945 Document #: 1 Filed: 04/24/14 Page 27 of 48 PageID #:27

actions.

**COUNT I**

**42 U.S.C. § 1983 – Coerced and False Confession (Fifth Amendment)**

119. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

120. In the manner described more fully above, Defendants Holmes, Roberts, Walsh, Boock, Mischka, and Midona, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

121. The false statements drafted by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case.

122. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

123. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing

injuries and damages as set forth above.

124. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police officers regularly used coercive measures to obtain inculpatory statements from criminal suspects.

125. This widespread practice of obtaining statements in violation of the Fifth Amendment was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

126. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

127. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT II**

**42 U.S.C. § 1983 – Coerced and False Confession**
**(Fourteenth Amendment)**

128. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

129. In the manner described more fully above, Defendants Holmes, Roberts, Walsh, Boock, Mischka, and Midona, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

130. As described in detail above, the misconduct described in this Count consisted of physical and psychological coercion. This misconduct to cause an obviously mentally-disabled individual to falsely implicate himself in a vicious rape that never occurred, was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

131. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

132. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing

injuries and damages as set forth above.

133. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used coercive measures to obtain inculpatory statements from criminal suspects.

134. This widespread practice of obtaining statements in violation of the Fourteenth Amendment was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

135. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

136. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT III**

**42 U.S.C. § 1983 – Federal Malicious Prosecution[1]**

137. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

138. In the manner described above, Defendant Holmes and the Law Enforcement Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, falsely accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

139. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

140. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total

[1] Plaintiff recognizes that this Circuit currently holds that malicious prosecution is not actionable under 42 U.S.C. § 1983 in Illinois. Other Courts of Appeals have taken the opposite position. Plaintiff pleads the claim here to preserve the issue for reconsideration in the Seventh Circuit Court of Appeals or review in the Supreme Court of the United States.

disregard of the truth and Plaintiff's innocence.

141. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

142. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by coercing false confessions, withholding exculpatory evidence, fabricating inculpatory evidence, and otherwise instituting and continuing prosecutions maliciously and without probable cause.

143. This widespread practice of instituting and continuing prosecutions maliciously and without probable cause through the use of false confessions, fabrication of inculpatory evidence, and withholding of exculpatory evidence was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

144. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City

of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

145. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT IV**

**42 U.S.C. § 1983 – Due Process**

146. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147. As described in detail above, the Law Enforcement Defendants and Defendant Holmes, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

148. In the manner described more fully above, the Law Enforcement Defendants and Defendant Holmes deliberately withheld exculpatory evidence from Plaintiff and from the prosecutors, among others.

149. In addition, the Law Enforcement Defendants and Defendant Holmes, acting as investigators, fabricated evidence and solicited false evidence, including testimony that they knew

Case: 1:14-cv-02945 Document #: 1 Filed: 04/24/14 Page 34 of 48 PageID #:34

to be false and perjured, and fabricated reports implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

150. The Law Enforcement Defendants and Defendant Holmes' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

151. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

152. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

153. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly used unconstitutional measures to falsely implicate criminal

suspects, including by coercing false confessions, withholding exculpatory evidence, and fabricating inculpatory evidence.

154. This widespread practice was so well-settled as to constitute de facto policy in the Chicago Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

155. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

156. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT V**

**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

157. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

158. Prior to Plaintiff's conviction, all of the individual Defendants, excepting those sued in their official capacity, acting in concert with other co-conspirators, known and unknown,

reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

159. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

160. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

161. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

162. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VI**

**42 U.S.C. § 1983 – Failure to Intervene**

163. Plaintiff incorporates each paragraph of this

Complaint as if fully restated here.

164. In the manner described above, during the constitutional violations described herein, one or more of the Law Enforcement Defendants and Defendant Holmes stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

165. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

166. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

167. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that Chicago Police Department officers regularly failed to intervene to prevent the violation of suspects' constitutional rights.

168. This widespread practice of failing to intervene to prevent the violation of suspects' constitutional rights was so well-settled as to constitute de facto policy in the Chicago

Police Department, and was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

169. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they ignore the violation of citizens' constitutional rights with impunity.

170. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**Count VII - 42 U.S.C. § 1983**

**Supervisory Liability**

171. Each paragraph of this Complaint is incorporated as if restated fully herein.

172. Plaintiff's malicious prosecution and wrongful conviction were caused by the intentional misconduct by the supervisory defendants, including Defendants Walsh, Holy, and Joria, or when they were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Mr. Chatman's constitutional rights.

173. Specifically, these supervisory defendants were aware of and facilitated, condoned, and oversaw the coercive tactics used by some of the Defendants to obtain Plaintiff's false confession, or were deliberately, recklessly indifferent to their subordinates' unconstitutional tactics.

174. Moreover, these supervisory Defendants were aware of and facilitated, condoned, and oversaw the withholding of exculpatory evidence, including but not limited to the existence of the sleeping deputy referenced above, but failed to disclose that information, or were deliberately, recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

175. In addition, these supervisory Defendants were aware of and facilitated, condoned, and oversaw the fabrication of inculpatory evidence, or were deliberately, recklessly indifferent to their subordinates' unconstitutional actions in fabricating exculpatory evidence.

176. The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

177. The misconduct described in this Count was objectively

unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

**COUNT VIII**

**State Law Claim - Malicious Prosecution**

178. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

179. In the manner described above, the individual Defendants, excepting those sued in their official capacity, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, falsely accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

180. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

181. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total

disregard of the truth and Plaintiff's innocence.

182. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT IX**

**State Law Claim – Intentional Infliction of Emotional Distress**

183. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

184. The actions, omissions, and conduct of the individual Defendants, excepting those sued in their official capacity, as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

185. As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

**COUNT X**

**State Law Claim – Civil Conspiracy**

186. Plaintiff incorporates each paragraph of this

Complaint as if fully restated here.

187. As described more fully in the preceding paragraphs, the individual Defendants, excepting those sued in their official capacities, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

188. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

189. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

190. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI

### State Law Claim – Defamation

191. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

192. Defendant Riggio published and caused to be published intentionally false statements about or concerning Plaintiff that she knew to be false, including repeatedly falsely accusing Plaintiff of rape, and in so doing committed defamation per se.

193. By engaging in the misconduct described in this Count, Defendant Riggio made demonstrably false statements about and concerning Plaintiff to third parties, and she caused those statements to be widely published in major public newspapers distributed throughout the entire world. The things Defendant Riggio said about or concerning Plaintiff were malicious, shocking, outrageous, and offensive, and Defendant Riggio made these statements knowing that they were entirely false.

194. The statements made by Defendant Riggio described above are wholly untrue accusations of rape, which is a crime that constitutes defamation per se in Illinois.

195. Defendant Riggio acted with actual malice, reckless intent and gross indifference to the false and misleading nature of her statements about and concerning Plaintiff when she made them to third parties.

196. These defamatory falsehoods were made with actual malice by Defendant Riggio inasmuch as she knew of their falsity or recklessly disregarded their truth or falsity.

197. As a result of Defendant Riggio's misconduct described in this Count, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

198. In particular, Defendant Riggio's defamatory publications have injured and continue to injure Plaintiff in the following ways, among others: (a) by impugning Plaintiff's personal reputation in the community such that individuals who Plaintiff interacts with question whether he is a rapist; (b) by limiting Plaintiff's employment options and his future career prospects; (c) by causing Plaintiff to be prosecuted and convicted for a crime he did not commit and spend over 11 years wrongfully imprisoned; and (d) by subjecting Plaintiff to harassment and additional persecution for a crime he did not commit.

199. The actions and omissions of Defendant Riggio set forth in this Count demonstrate malice, egregious defamation, and insult. Defendant Riggio's actions and omissions were

undertaken either with malice, spite, ill will, vengeance, or deliberate intent to harm Plaintiff, or with reckless disregard to the falsity of the speech and its effect on Plaintiff. Accordingly, Plaintiff is entitled to punitive damages and attorneys' fees beyond those damages, described above, that will compensate Plaintiff for injuries resulting from Defendant Riggio's conduct.

**COUNT XII**

**State Law Claim – Respondeat Superior**

200. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

201. While committing the misconduct alleged in the preceding paragraphs, Defendant Holmes and the Law Enforcement Defendants were employees, members, and agents of the City of Chicago, the Cook County Sheriff's Department, and the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment.

202. Defendants City of Chicago, Sheriff Dart, State's Attorney Alvarez, are liable as principals for all torts committed by their agents.

**COUNT XIII**

**State Law Claim – Indemnification**

203. Plaintiff incorporates each paragraph of this

Complaint as if fully restated here.

204. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

205. Defendant Holmes and the Law Enforcement Defendants were employees, members, and agents of the City of Chicago, the Cook County Sheriff's Department, and/or the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

206. Cook County is obligated by Illinois statute to pay any judgment entered against the Sheriff of Cook County in his official capacity.

207. Cook County is obligated by Illinois statute to pay any judgment entered against Defendants Holmes or Alvarez.

WHEREFORE, Plaintiff CARL CHATMAN, respectfully requests that this Court enter a judgment in his favor and against Defendants City of Chicago, Chicago Police Detective John Roberts, Chicago Police Detective Thomas McGreal, Chicago Police Detective Maria Pena, Chicago Police Detective Jack Boock, Chicago Police Detective Rita Mischka, Chicago Police Detective Barbara Midona, Chicago Police Sergeant Dennis Walsh, Chicago

Police Officer Michael Karczewski, Chicago Police Officer Richard Griffin, Chicago Police Lieutenant Joseph Joria, Chicago Police Sergeant Bryan Holy, and unknown Chicago Police Officers, along with the County of Cook, Assistant State's Attorney Brian Holmes, Cook County Sheriff's Deputy Michael Cokeley, Cook County Sheriff's Deputy Joseph Prince, Cook County Sheriff's Deputy Sergeant Maria Mokstad, Cook County Sheriff's Deputy Lieutenant Burrough Cartrette, unknown Cook County Sheriff's Deputies, Thomas Dart in his official capacity as Sheriff of Cook County, and Anita Alvarez in her official capacity as Cook County State's Attorney; together with Susan Riggio, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, excepting those sued in their official capacities, and any other relief this Court deems just and appropriate.

JURY DEMAND

Plaintiff, CARL CHATMAN, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

Russell Ainsworth
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Russell Ainsworth
Elizabeth Wang
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

NOTICE
The text of this opinion may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

2016 IL App (1st) 152395
No. 1-15-2395
Opinion filed September 30, 2016

FIFTH DIVISION

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 02 CR 14572 |
| CARL CHATMAN, | ) | |
| Defendant-Appellee | ) | The Honorable Timothy Joyce, Judge, presiding. |
| (Susan Riggio, | ) | |
| Petitioner-Appellant). | ) | |

---

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Lampkin specially concurred, with opinion.

## OPINION

¶ 1 This appeal raises a purely legal question: does the complainant in a criminal case have standing to bring a petition, pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2014)),[1] for the purpose of challenging a court's prior grant of a certificate of innocence to a criminal defendant?

¶ 2 In the case at bar, petitioner Susan Riggio filed a section 2-1401 petition on December 29, 2014, seeking to vacate a trial court's order, entered on November 19, 2013. The order granted a certificate of innocence to defendant Carl Chatman, who was petitioner's alleged assailant. On July 20, 2015, the trial court granted the State and defendant's motions to dismiss her petition for lack of standing, and she appealed.

¶ 3 Petitioner argues that she has standing pursuant to the Illinois Constitution and various Illinois statutes[2] which provide rights to crime victims. However, as we explain below, she does not satisfy the definition of the term "[c]rime victim," provided by our legislature and quoted in her brief. Pub. Act 99-413 (eff. Aug. 20, 2015) (amending 725 ILCS 120/3(a) (West 2014)). In

[1] Section 2-1401 was amended effective January 1, 2016, to add subsection (b-5). However, this subsection has no relevance to our issue and is not cited or quoted in this opinion. Prior to this amendment, the effective date of this section was August 21, 2007.

[2] Since there is an issue about which version of these constitutional amendments and statutes apply, we provide the citations in the analysis section where we discuss these issues at greater length.

addition, as the State observes, the legislature has authorized only the State's Attorney and the Attorney General to intervene in the civil proceeding for a certificate of innocence. 735 ILCS 5/2-702(e) (West 2012) (expressly providing only the Attorney General and the State's Attorney with "the right to intervene as parties").

¶ 4 We are mindful that our decision today might not leave petitioner with a level playing field in a contemporaneous federal civil action, which was filed by defendant against petitioner and various state entities and officials for damages in connection with his prior conviction and incarceration. At oral argument on this matter, defendant's attorney forthrightly admitted that defendant is seeking to admit his Illinois certificate of innocence as evidence of his innocence, and therefore evidence of petitioner's alleged lies, in that federal action. However, pure speculation about what may or may not be admitted in a federal action does not change the laws governing standing in a state court. For the following reasons, we affirm.

¶ 5 BACKGROUND

¶ 6 Petitioner appeals, stating that this appeal presents a pure question of law, and we agree. Thus, we present here only the few procedural facts needed to understand the legal question at hand.

¶ 7 In September 2013, the State moved to vacate defendant's 2004 rape conviction and sentence in People v. Chatman, No. 02 CR 14572 (Cir. Ct. Cook Co.), a case in which petitioner had been the complainant. In its motion, the State asked "that the matter be reinstated and redocketed," so that it could "move to vacate the conviction and sentence and move to nolle pros the conviction" and "request that the defendant, Carl Chatman, be released immediately from the custody of the Illinois Department of Corrections."

¶ 8 Petitioner concedes that she received prior notice of thc State's decision to move to vacate defendant's conviction and sentence.[3] Although the State's attorney had a duty to notify her by first-class mail,[4] and petitioner was notified by telephone instead, petitioner does not challenge the method of notice here.

¶ 9 On September 10, 2013, the trial court issued a written order granting the State's motion, which stated in full:

> "It is Hereby Ordered that pursuant to the State's motion to reinstate the matter, the conviction and sentence in the above-captioned matter are

---

[3] At a hearing on November 19, 2013, which concerned defendant's motion to dismiss for lack of standing, petitioner's attorney stated that "she received a phone call the night before" informing her of the State's intent to move to vacate the conviction.

[4] Section 3-9005 of the Counties Code, which sets forth the powers and duties of a State's Attorney, provides that a State's Attorney has a duty to "notify, by first class mail, complaining witnesses of the ultimate disposition of the cases arising from an indictment or an information." 55 ILCS 5/3-9005(a)(10) (West 2012). However, section 3-9005 provides for no individual remedy or action.

vacated and it is further ordered that Carl Chatman, Inmate Number ***, be released immediately from the Illinois Department of Corrections."

The appellate record does not contain a transcript or bystander's report for these proceedings, and petitioner does not seek to challenge the order vacating defendant's conviction and releasing defendant.[5]

¶ 10 On October 25, 2013, defendant moved pursuant to section 2-702 of the Code (735 ILCS 5/2-702 (West 2012)) for a certificate of innocence. The State did not oppose it and, on November 19, 2013, the trial court granted it. It is this order that petitioner seeks to challenge in her section 2-1401 petition. She claims that she was not notified of defendant's motion, and neither defendant nor the State claims that she was.

¶ 11 On December 29, 2014, petitioner filed her section 2-1401 petition seeking to vacate the certificate of innocence granted to defendant 14 months earlier. The caption of her petition stated: ""The People of the State of Illinois, Plaintiff, v. Carl Chatman, Defendant. No. 02 CR 14572." Attached as an exhibit to the petition was a complaint filed on April 24, 2014, by defendant against the City of Chicago and 21 other named entities and individuals,

[5] In her brief to the trial court, petitioner stated unequivocally that she "is not intervening in a criminal proceeding nor is she attempting to overturn the [State's] vacation of [defendant's] conviction." Similarly, in her reply brief to the trial court, she repeated that she "is not attempting to disturb the [State's] decision to vacate [defendant's] conviction."

pursuant to 42 U.S.C. § 1983 (2012).[6] The last of the 21 named entities and individuals was petitioner. The complaint alleged that defendant spent 11 years in prison for a crime he did not commit. In addition to the section 1983 claims, the complaint also included state law claims for malicious prosecution, intentional infliction of emotional distress, civil conspiracy and defamation. The defamation count specifically named petitioner.

¶ 12 On March 4, 2015, the State filed a response to the section 2-1401 petition in which it observed that defendant had already filed a "motion to strike" the section 2-1401 petition on the ground that petitioner lacked the standing to bring it, and the State adopted and joined defendant's motion.[7] However, defendant's motion is not in the appellate record.[8] It is this missing motion which is the subject of this appeal.[9]

---

[6] The copy of the section §1983 complaint in the appellate record bears a typed notation across the top of the first page stating that it was filed on April 24, 2014. However, the document is not file-stamped as received.

[7] In her response to defendant's motion to strike, petitioner states that defendant filed his motion on January 29, 2015.

[8] In their appellate briefs, all three parties refer to the motion, but without the required citation to the record. This court is mystified why, if all three parties were aware that this document was missing, none saw fit to file a motion to supplement the record. See Ill. S. Ct. R. 341(h)(6) (eff. Jan. 1, 2016) (the statement of facts "shall contain the facts necessary to an understanding of the case *** with appropriate reference to the pages of the record on appeal").

[9] We could decide the appeal on this basis alone. It was the appellant's burden to provide a sufficiently complete record for us to review the issues which she raises on appeal, and we could affirm the trial court simply on her failure to provide a complete record. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); see

¶ 13 On July 20, 2015, the trial court granted the State's and defendant's motion to dismiss on the ground that petitioner lacked standing. The trial court found that "[n]o notice of the petition for the certificate of innocence was given to [petitioner]," but concluded that petitioner was not entitled to notice. Petitioner had argued that she was entitled to notice pursuant to both the Illinois Constitution and various statutes[10] which provide rights to crime victims. In response, the trial court observed in its written order:

> "First, how is it established that one is, or is not, a 'victim'?[11] Obviously, Riggio claims that she is and always has been. Curiously, the State once believed and alleged that Riggio was, and now they claim that she is not, or at least that she may not be, as evidenced by their motion to vacate Chatman's conviction, and seek his immediate release. Chatman presumably has always believed that she was not.
>
> Thus, whether [she is] afford[ed] standing in connection with this proceeding would presumably require some type of hearing to determine

---

also Ill. S. Ct. R. 341(h) (eff. Jan. 1, 2016). However, we exercise our discretion to review the parties' claims based on the detail provided about those claims in the trial court's order.

[10] As we noted above, since there is an issue about which version of these constitutional amendments and statutes apply, we provide the citations in the analysis section where we discuss these issues at greater length.

[11] As we discuss later in the analysis, our legislature realized this problem and addressed it last year, by providing a definition of "[c]rime victim" which identifies who determines whether a person is, in fact, a "[c]rime victim." Pub. Act 99-413 (eff. Aug. 20, 2015) (amending 725 ILCS 120/3(a) (West 2014).

whether she is a 'victim.' That, however, is putting the cart before the horse, if she is then determined to be a 'victim,' then Chatman would resultantly be determined to be guilty of having victimized her, and thus not entitled to a certificate of innocence. Standing would thus be conferrable only to those who can 'prove' (in some manner not set out by the Constitution or any statute) that they are entitled to the relief they seek.

This is circuitous. The concept of standing relates to the ability to make a claim. Standing is not synonymous with having a successful claim; it is having the ability conferred by our Constitution and the laws of this State to make the claim, whether or not it is thereafter succeeded upon."

¶ 14 The trial court then observed that the law "affords no relief for any claimed violation" of its provisions for crime victims, and that this was "consistent with the well-established precepts regarding responsibility of the maintenance of criminal prosecutions in this State" by the State's Attorney or the Attorney General, but not by individual members of the public. The trial

court concluded that petitioner was without standing to maintain her section 2-1401 action.[12]

¶ 15 Petitioner filed a notice of appeal on August 17, 2015, stating: "This is an appeal from an order granting the motions of [defendant] Carl Chatman and the Cook County State's Attorney's Office to dismiss Susan Riggio's petition pursuant to 735 ILCS 5/2-1401, holding that appellant, Susan Riggio, does not have standing to challenge the Court's grant of a Certificate of Innocence to Carl Chatman pursuant to 735 ILCS 5/2-702, *et seq*." This appeal followed.

¶ 16 ANALYSIS

¶ 17 In the case at bar, petitioner filed a section 2-1401 petition seeking to vacate a trial court's prior order, which had granted a certificate of innocence to petitioner's alleged assailant in a criminal case. The trial court granted the State and defendant's motion to dismiss her petition for lack of standing and, for the following reasons, we affirm.

¶ 18 I. Section 2-1401

¶ 19 Petitioner filed her petition pursuant to section 2-1401. 735 ILCS 5/2-1401 (West 2014).

[12] The parties make arguments on this appeal concerning the timeliness of petitioner's petition and whether she exercised due diligence in filing it. However, the trial court's written order stated that it was holding only that petitioner was "without standing to maintain this action." Thus, those issues are not before us on this appeal.

¶ 20 "Section 2-1401 of the Code of Civil Procedure [citation] establishes a comprehensive procedure by which final orders and judgment may be vacated or modified more than 30 days after their entry." *Paul v. Gerald Adelman & Associates, Ltd*, 223 Ill. 2d 85, 94 (2006). It provides, in relevant part, that: "Relief from *** orders and judgments, after 30 days from the entry thereof, may be had upon petition as provided in this Section." 735 ILCS 5/2-1401(a) (West 2014). "The petition must be filed in the same proceedings in which the order or judgment was entered but is not a continuation thereof. The petition must be supported by affidavit or other appropriate showing as to matters not of record. All parties to the petition shall be notified as provided by rule." 735 ILCS 5/2-1401(b) (West 2014). "[T]he petition must be filed not later than 2 years after the entry of the order of judgment." 735 ILCS 5/2-1401(c) (West 2014).

¶ 21 "[A] section 2-1401 petition is ordinarily used to bring facts to the attention of the trial court which, if known at the time of judgment, would have precluded its entry," and it also may "be used to challenge a purportedly defective judgment for legal reasons." *Paul*, 223 Ill. 2d at 94.

¶ 22 II. Standard of Review

¶ 23 Where the success of a section 2-1401 petition is dependent entirely on the interpretation of a rule or statute, that legal issue will be reviewed *de novo*.

*Paul*, 223 Ill. 2d at 98. In the case at bar, we are faced with an entirely legal question, namely, which statutory section governs the issue of standing and whether the appropriate section permits petitioner to have standing. Thus, *de novo* review applies.

¶ 24 In addition, when a trial court enters judgment on the pleadings alone or grants a motion to dismiss a section 2-1401 petition due to a failure to state a cause of action or due to a legal insufficiency, we apply a *de novo* standard of review. *People v. Vincent*, 226 Ill. 2d 1, 13-18. (2007). Thus, *de novo* review also applies for this reason.

¶ 25 "A *de novo* review entails performing the same analysis a trial court would perform. That is, we accept all well-pleaded facts in the [petition] as true while disregarding legal or factual conclusions unsupported by allegations of fact. [Citation.] From the well-pleaded facts, we draw inferences in the [petitioner's] favor whenever it would be reasonably defensible to do so. [Citation.]" *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 26 III. Standing

¶ 27 The issue before us is whether petitioner has standing. "Under Illinois law, lack of standing is an affirmative defense. A plaintiff need not allege facts establishing that he [or she] has standing to proceed. Rather, it is the defendant's burden to plead and prove lack of standing." *Wexler v. Wirtz Corp.*, 211 Ill. 2d

18, 22 (2004). "Where a plaintiff has no standing, the proceedings must be dismissed *** because lack of standing negates a plaintiff's cause of action." *Wexler*, 211 Ill. 2d at 22. The issue of a plaintiff's standing presents a question of law, which we also review *de novo*. *Wexler*, 211 Ill. 2d at 23.

¶ 28 IV. Statutory Interpretation

¶ 29 On this appeal, petitioner claims that article I, section 8.1 of the Illinois Constitution (Ill. Const. 1970, art. I, §8.1) and section 2-408 of the Code (735 ILCS 5/2-408 (West 2012)) govern the standing issue, while the State and defendant argue that section 2-702 of the Code applies. 735 ILCS 5/2-702(e) (West 2012) (describing who "shall have the right to intervene as parties" with a petition for certificate of innocence). We must interpret these sections to ascertain whether any of these sections permit petitioner to have standing.

¶ 30 With both constitutional and statutory interpretation, our primary goal is to ascertain the drafters' intent, and the best indication of their intent is the plain language of their words. *MD Electrical Contractors, Inc. v. Abrams*, 228 Ill. 2d 281, 287 (2008). However, when interpreting a constitution or statute, we do not read a portion of it in isolation; instead, we read it in its entirety, keeping in mind the subject it addresses and the drafters' apparent objective in enacting it. *MD Electrical Contractors*, 228 Ill. 2d at 287.

¶ 31 V. Section 2-702

¶ 32 The State and defendant argue that section 2-702 takes precedence in our determination of standing.

¶ 33 Section 2-702 permits a criminal defendant to move the court for a certificate of innocence if: (1) his or her conviction was reversed or vacated, and the indictment or information was dismissed; or (2) a new trial was ordered and either (a) he or she was found not guilty at the new trial or (b) no retrial was held and the indictment or information was dismissed; or (3) the statute upon which the indictment or information was based was declared unconstitutional. 735 ILCS 5/2-702(c)(2) (West 2012).

¶ 34 Section 2-702 requires the criminal defendant to serve only the Attorney General and the State's Attorney. Section 2-702(e) provides: "A copy of the petition shall be served on the Attorney General and the State's Attorney of the county where the conviction was had. The Attorney General and the State's Attorney of the county where the conviction was had *shall have the right to intervene* as parties." (Emphasis added.) 735 ILCS 5/2-702(e) (West 2012).[13] "Under the maxim of *expressio unius est exclusio alterious*, the enumeration of

---

[13] In the case at bar, the Attorney General and the State's Attorney do not claim that defendant failed to effect proper service on them. However, in the court below, petitioner claimed, in her brief in response to defendant's motion to strike, that defendant had failed to provide notice to the Attorney General's office when he sought his certificate of innocence, as required by section 2-702(e) (735 ILCS 5/2-702(e) (West 2012)). On appeal, petitioner does not pursue this argument.

an exception in a statute is considered to be an exclusion of all other exceptions." *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 17 (citing *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 286 (2003)). This rule is based on " 'logic and common sense,' " as it is " 'common experience' " that " 'when people say one thing' " they do not intend another. (Internal quotation marks omitted.) *Schultz*, 2013 IL 113776, ¶ 17 (quoting *Cryns*, 203 Ill. 2d at 286). "When a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions, despite the lack of any negative words of limitation." *In re C.C.*, 2011 IL 111795, ¶ 34. Thus, this section provides only the Attorney General and the State's Attorney with the right to intervene, and petitioner does not have that right. See also *In re C.C.*, 2011 IL 111795, ¶ 34 (where a statutory section lists "those that are necessary parties to the proceedings," the omission of "others from that list should be understood as an exclusion").

¶ 35 Even if we were to find that section 2-702 did not *prohibit* petitioner's intervention, it certainly does not *authorize* it, and petitioner does not argue that it does. Thus, petitioner would still need another statute or theory which does *authorize* her intervention and provide her with standing. As we discuss below, there is none.

¶ 36 Petitioner claims in her appellate brief that defendant's certificate of innocence "exposes her to considerable financial liability, including the potential for punitive damages." However, section 2-702(j) specifically provides that: "The decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings." 735 ILCS 5/2-702(j) (West 2012). Thus, we do not find this claim persuasive.

¶ 37 VI. Section 2-408

¶ 38 Petitioner argues that both article I, section 8.1 of the Illinois Constitution (Ill. Const. 1970, Art. I, § 8-1 and section 2-408 (735 ILCS 5/2-408 (West 2012))[14] provide her with standing. Since we turn to constitutional issues only as a last resort, we turn first to petitioner's statutory argument. *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort").

¶ 39 On this appeal, petitioner argues that section 2-408 of the Code (735 ILCS 5/2-408 (West 2014)) provides her with standing. However, in the court below, petitioner initially argued just the opposite. In her initial brief to the trial court, petitioner stated unequivocally that she was "not attempting to intervene

---

[14] Since this section was last amended in 1982, it makes little difference which code year is cited.

under 735 ILCS 5/2-408 *** as [defendant] tries to claim; therefore any argument relating to intervening under Section 2-408 is irrelevant to the issue of standing."[15] Despite this unequivocal statement, petitioner argued in her reply brief for intervention under section 2-408, without indicating that she was switching positions.

¶ 40 The reply brief is not the place to raise new arguments and switch positions, and normally arguments raised there for the first time are considered forfeited.[16] Nonetheless, since the State and defendant were permitted to submit briefs in the trial court after petitioner's reply brief, and the parties argued the issue at the hearing before the trial court, we will consider it.

---

[15] The State argues that, as a result, petitioner has forfeited her right to have this issue reviewed on appeal. The State is correct that a person cannot invite the trial court to take an action and then complain about that same action in a reviewing court. *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 99; *Lozman v. Putnam*, 379 Ill. App. 3d 807, 828-29 (2008). The Illinois Supreme Court has held, under " 'the doctrine of invited error,' " that a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Carter*, 208 Ill. 2d 309, 319 (2003)). However, for the reasons explained in the text, we will consider it.

[16] "Almost a century ago, our supreme court noted, 'Under the rules of this court and its long[-]settled practice, questions not raised *** in the original brief cannot be raised in the reply brief. A contrary practice would permit [movants] to argue questions in their reply briefs as to which counsel for [their opponents] would have no opportunity to reply. The[ese] question[s] therefore need not be considered.' " *People v. English*, 2011 IL App (3d) 100764, ¶ 22 (quoting *Holliday v. Shepherd*, 269 Ill. 429, 436 (1915)).

¶ 41 Petitioner argues that section 2-408 of the Code (735 ILCS 5/2-408 (West 2014)) provides her with standing under both subsection (a) which authorizes certain interventions as of right; and subsection (b) which governs permissive interventions.[17]

¶ 42 Petitioner argues that she has standing under the portion of subsection (a) which provides for intervention "as of right":

> "(2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action[.]" 735 ILCS 5/2-1408(a)(2) (West 2014).

To qualify under the above subsection, petitioner must show that she "may be *bound* by an order *** in the action." (Emphasis added.) 735 ILCS 5/2-1408(a)(2) (West 2014).[18] However, as we already noted above, a different

---

[17] This section, which provides a right of intervention, is part of the Code of Civil Procedure and hence, one could argue that it provides a right to intervene in civil cases only. While a proceeding under section 2-1401 is a civil proceeding, what petitioner ultimately seeks is the right to intervene to prevent the expungement of defendant's *criminal* conviction. 735 ILCS 5/2-702(h) (West 2012). However, we do not find this to be a stumbling block because the proceeding to obtain a certificate of innocence is also provided for in the Code of Civil Procedure. 735 ILCS 5/2-702 (West 2012).

[18] In support of her argument that she may be bound, petitioner cites an unpublished Illinois circuit court order. In response, defendant argues that unpublished orders are "not binding or precedential on our court," and he is correct. *FHP Tectonics Corp. v. American Home Assurance Co.*, 2016 IL App (1st) 130291,¶ 45 n.4 (citing *King's Health Spa, Inc. v. Village of Downers Grove*, 2014

section of the same Code guarantees that "[t]he decision to grant or deny a certificate of innocence shall be *binding* only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings." (Emphasis added.) 735 ILCS 5/2-702(j) (West 2012). The drafters of the Code chose to use the exact same word in both provisions, since "bound" is simply the past tense of "bind." Grammarist, http://www.grammarist.com/usage/bound-bounded (last visited Aug. 22, 2016). Thus, the drafters already considered and addressed petitioner's concern. In sum, to qualify under section 2-408(a)(2), she must show that she "may be bound" (735 ILCS 5/2-408(a)(2) (West 2014)), but a subsequent section of the same Code states—not only that she cannot be—but that she cannot be in "any other proceedings." 735 ILCS 5/2-702(j) (West 2012). As a result, section 2-408(a)(2) does not provide petitioner with standing.

¶ 43 Petitioner also argues that she has standing under the portion of subsection (b) which provides for intervention "in the discretion of the court":

---

IL App (2d) 130825, ¶ 63). In general, we do not cite unreported cases. *State Farm Mutual Automobile Insurance Co. v. Progressive Northern Insurance Co.*, 2015 IL App (1st) 140447, ¶ 101 ("[W]e will not cite an unreported case."); *Skokie Castings, Inc. v. Illinois Insurance Guaranty Fund*, 2012 IL App (1st) 111533, ¶ 15 ("an unreported case" is "not binding on any court"); *People v. Moore*, 243 Ill. App. 3d 583, 584 (1993) ("the decision was unreported and of no precedential value"). "Unreported decisions have no precedential value." *American Family Mutual Insurance Co. v. Plunkett*, 2014 IL App (1st) 131631, ¶ 38. Nonetheless, we consider her claim.

> "(1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." 735 ILCS 5/2-408(b) (West 2014).

Petitioner argues that, she has standing under subsection (1), quoted above, because article I, section 8.1 of the Illinois Constitution grants her a conditional right to intervene. Since this is just a rephrasing of her constitutional argument, we will address it when we discuss the constitutional issue in the next section.

¶ 44 As for subsection (2), quoted above, there is no question that an abuse of discretion standard applies, since the statute specifically states that the intervention is "in the discretion of the court." 735 ILCS 5/2-408(b) (West 2014); see also *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 58 (2002) ("The decision to allow or deny intervention, whether permissively or as of right, is a matter of sound judicial discretion that will not be reversed absent an abuse of that discretion."). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanicful or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 45 Petitioner argues that the trial court abused its discretion in denying her a permissive intervention under subsection (2) because defendant's federal section 1983 suit has "questions of fact in common" with the prior certificate-of-

innocence petition. Petitioner makes this argument in one line in her brief without any cases or secondary authority cited in support. In response, defendant argues that petitioner does not make "even a pretense of arguing" the point and does not cite authority because "[t]here is no authority for finding that a court abuses its discretion for failing to find standing and reopen a completed case merely because there were possible factual issues in common with another" subsequent suit.[19] Like both petitioner and defendant, we also cannot find authority in support, and thus do not find this argument persuasive. *Birkett*, 202 Ill. 2d at 57 ("The purpose" of the civil intervention statute is "to avoid, upon timely application, the relitigation of issues in a second suit which were being litigated in a *pending* action." (Emphasis added)).

[19] Where a party made a "claim in one line without any factual support or legal argument," this court found it forfeited. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 824 (2008). This court has repeatedly held that a party forfeits a point by failing to argue it. *Lozman*, 379 Ill. App. 3d at 824; *Rosier v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs forfeited consideration of their theory); *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); *Ferguson v. Bill Berger, Associates, Inc.*, 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation of other support as Supreme Court Rule 341 requires); Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (the argument section of the appellant's brief "shall contain the contentions of the appellant *** with citation of the authorities *** relied on").

¶ 46 VII. Illinois Constitution

¶ 47 Petitioner also argues that article I, section 8.1 of the Illinois Constitution (Ill. Const. 1970, art. I, § 8.1) provides her with standing and takes precedence over section 2-702 (735 ILCS 5/2-702 (West 2012)).

¶ 48 Article I, section 8.1 is entitled "Crime Victims' Rights." On November 19, 2013, which is when the trial court granted defendant's certificate of innocence, section 8.1 provided in relevant part:

> "(a) Crime victims, as defined by law, shall have the following rights, as provided by law:
>
> * * *
>
> (2) The right to notification of court proceedings.
>
> * * *
>
> (5) The right to information about the conviction, sentence, imprisonment, and release of the accused.
>
> * * *
>
> (8) The right to be present at the trial and all other court proceedings on the same basis as the accused, unless the victim is to testify and the court determines that the victim's testimony would be materially affected if the victim hears other testimony at the trial.

(9) The right to have present at all court proceedings, subject to the rules of evidence, an advocate or other support person of the victim's choice." Ill. Const. 1970, art. I, § 8.1(a) (amended 1992).

¶ 49 On November 4, 2014, which was just over a month before petitioner filed her section 2-1401 petition, article I, section 8.1 was amended. We repeat below the portion that was quoted above, with the portions that were changed or added shown in italics and with omitted portions indicated by brackets:

"(a) Crime victims, as defined by law, shall have the following rights[]:

* * *

(*3*) The right to *timely* notification of *all* court proceedings.

* * *

(*6*) The right *to be notified of* the conviction, *the* sentence, *the* imprisonment, and *the* release of the accused.

* * *

(*10*) The right to be present at the trial and all other court proceedings on the same basis as the accused, unless the victim is to testify and the court determines that the victim's testimony would be materially affected if the victim hears other testimony at the trial.

(*11*) The right to have present at all court proceedings, subject to the rules of evidence, an advocate *and* other support person of the victim's

> choice." (Emphases added.) Ill. Const. 1970, art. I, § 8.1(a) (amended 2014).

¶ 50 In addition, the following section was added to article I, section 8.1 on November 4, 2014, to provide standing to a victim as follows:

> "(b) The victim has standing to assert the rights enumerated in subsection (a) in any court exercising jurisdiction over the case. The court shall promptly rule on a victim's request. The victim does not have party status. The accused does not have standing to assert the rights of a victim. The court shall not appoint an attorney for the victim under this Section. Nothing in this Section shall be construed to alter the powers, duties, and responsibilities of the prosecuting attorney." Ill. Const. 1970, art. I, § 8.1(b) (amended 2014).

¶ 51 Before the trial court and before this court, petitioner argues that the 2014 amendments have retroactive application to defendant's certificate of innocence which the trial court granted in 2013.

¶ 52 However, before we can determine whether petitioner can benefit from the 2014 amendments, we must determine if she qualifies as a "victim." In both the 1992 and 2014 versions, article I, section 8.1 stated that it applied to "[c]rime victims" and that the term "[c]rime victim[]" was "defined by law." Ill. Const. 1970, art. I, § 8.1(a). That "law" is the Rights of Crime Victims and

Witnesses Act which states that "[t]he purpose of this Act is to implement *** the rights guaranteed to crime victims by Article 1, Section 8.1 of the Illinois Constitution" (Act) (725 ILCS 120/2 (West 2012)).[20]

¶ 53 The Act has been amended every year from 2010 through 2016. However, the definition of the term "victim" was the same on November 19, 2013, when the trial court ordered defendant's certificate of innocence,[21] as it was when the parties argued about standing before the trial court in 2014 and 2015.

¶ 54 At that time, the Act defined the term "[c]rime victim," in relevant part, as follows:

> "(a) 'Crime victim' and 'victim' mean (1) a person physically injured in this State as a result of a violent crime perpetuated or attempted against that person or (2) a person who suffers injury to or loss of property as a result of a violent crime perpetuated or attempted against that person or *** (4) any person against whom a violent crime has been committed ***." 725 ILCS 120/3(a) (West 2012).

---

[20] The quoted language has been in effect since 1994 (Pub. Act 88-489, §10 (eff. Jan. 1, 1994)) and is still in effect (725 ILCS 120/2 (West Supp. 2015)).

[21] The version of the Act contained in the 2012 Illinois Compiled Statutes was last amended effective January 25, 2013, and thus was the version in effect when the trial court ordered defendant's certificate of innocence on November 19, 2013, and thus the version in effect when the claimed error occurred.

¶ 55 Before the trial court, petitioner argued that she qualified as a victim under subsections (1) and (4), quoted above. People v. Chatman, No. 02 CR 14572, at 4 (Cir. Ct. Cook Co.) (discussing petitioner's argument).[22]

¶ 56 Before this court, petitioner argues that she qualifies as a victim under the definition provided in the same section, but in the version which became effective on August 20, 2015. The trial court granted defendant's and the State's motion to dismiss on July 20, 2015; and exactly a month later a new definition took effect, on August 20, 2015.[23] It is this 2015 definition that petitioner sets forth in her brief to this court,[24] and it states in relevant part:

> "(a) 'Crime victim' or 'victim' means: (1) any natural person determined by the prosecutor or the court to have suffered direct physical or psychological harm as a result of a violent crime perpetuated or attempted against that person ***." Pub. Act 99-413 (eff. Aug. 20, 2015) (amending 725 ILCS 120/3(a) (West 2014)).

---

[22] Petitioner argued this version of the statute both in her briefs to the trial court and also at the hearing before the trial court on the motion to dismiss for lack of standing.

[23] As petitioner observes in her brief, she filed her notice of appeal on August 17, 2015, and the new statute took effect three days later on August 20, 2015.

[24] Petitioner included the 2015 version of the Act in an appendix to her brief. This definition remained the same in the 2016 amendments. Pub. Act 99-671 (eff. Jan. 1, 2017).

¶ 57 It is interesting that petitioner would argue for the 2015 definition when, by the time that defendant sought his certificate of innocence, it had been "determined by the prosecutor" that petitioner had *not* suffered harm "as a result of a violent crime." Pub. Act 99-413 (eff. Aug. 20, 2015) (amending 725 ILCS 120/3(a) (West 2014)).

¶ 58 However, petitioner faces a conundrum. She cannot argue for the retroactivity of the new constitutional amendment about standing, without also arguing for the retroactivity of the new statutory amendment which implements it.[25] Petitioner cannot argue that whatever section most favors her is the one that should apply. Either we need to apply the constitutional amendment *and* statute that were in effect when the certificate of innocence was granted; or we need to apply the constitutional amendment and statute that are now in effect and find that they apply retroactively. But petitioner is well aware that we cannot apply the *new* constitutional amendment *with* the *old* implementing statute.

---

[25] Petitioner concedes in her appellate brief that the purpose of the 2015 statutory amendment was to implement the new constitutional amendment, and the legislative history leaves no doubt that this was the purpose. Representative Lang, the sponsor of the bill, stated that "last year we put on the ballot and passed a crime victim's Constitutional Amendment. This Bill, House Bill 1121, embodies the enabling language so that prosecutors and courts and victims and defendants all know what their rights and responsibilities are under that Constitutional Amendment." 99th Gen. Assem., House Proceedings, Apr. 23, 2015, at 115 (statements of Representative Lang). Thus, petitioner cannot argue for one without the other.

¶ 59 Recognizing this fact, petitioner argues for the *new* constitutional amendment which grants standing and the *new* statute which implements it. Thus, we will address the argument that petitioner now makes to us on appeal.

¶ 60 Since we should turn to constitutional issues only as a last resort, we will examine the implementing statute first. *In re E.H.*, 224 Ill. 2d at 178 ("cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort"). Interpreting the new definition is a question of first impression.

¶ 61 The new definition gives the courts and the prosecutor the power to decide who is, and is not, a victim. The old definition used the term "victim" but left open the question of who had the power to decide which complainants qualified as "victim[s]." In essence, the new implementing statute, which became law on August 20, 2015, answered the question which the trial court posed on July 20, 2015: "how is it established that one is, or is not, a 'victim'? Obviously, [petitioner] claims that she is and always has been [while] *** [defendant] has always believed that she was not." People v. Chatman, No. 02 CR 14572, at 4 (Cir. Ct. Cook Co.).

¶ 62 Although petitioner was definitely the complainant in the underlying criminal action, that does not necessarily mean that she was a victim. The terms "complainant" and "victim" are not the same. A "complainant" or

"complaining witness" is "the party who makes the complaint in a legal action or proceeding" (Merriam-Webster, http://www.merriam-webster.com/dictionary /complainant (last visited Aug. 22, 2016), while a "victim" is someone who is "determined to have suffered" actual harm. 725 ILCS 120/3(a) (West Supp. 2015).[26]

¶ 63 On appeal, petitioner argues that the courts and prosecutor "determined" that she was a victim when the prosecutor indicted defendant, a jury convicted him and the appellate court affirmed his conviction on appeal. See 725 ILCS 120/3(a) (West Supp. 2015). She argues that the prosecutor's subsequent decision to ask that the conviction be vacated and the trial court's decision to vacate that conviction and order the immediate release of defendant should have no effect on our decision. Petitioner characterizes the court's order as simply a *nolle prosequi*, and argues that a simple *nolle prosequi* is not a determination by the prosecutor or the court.[27]

---

[26] Our legislature is well aware of the difference between the two terms, choosing to use the two terms in different places in our statutes for different ends. *E.g.*, 55 ILCS 5/3-9005(a)(10) (West 2014) (a State's Attorney has a duty to "notify, by first class mail, complaining witnesses of the ultimate disposition of the cases arising from an indictment or an information"); see also 730 ILCS 105/35(c) (West 2014) (referring "to a victim *or* complaining witness" (emphasis added)).

[27] In support of her proposition that a *nolle prosequi* is not a determination, petitioner cites one unpublished federal district case. First, the numbers in the citation were incorrect, such that you could not locate the case with the citation provided. Second, this court has stated repeatedly that unpublished federal district

¶ 64 Petitioner is correct that the significance of a *nolle prosequi* can be ambiguous. A *nolle prosequi* is a "formal entry of record" of the decision by a prosecutor that he or she is no longer willing to prosecute a charge, and that decision can occur for any number of different reasons. *People v. Hughes*, 2012 IL 112817, ¶ 22 (a *nolle prosequi* signifies only a prosecutor's "unwillingness to prosecute a charge"); *People v. Artis*, 232 Ill. 2d 156, 169 (2009) (same).

¶ 65 However, what happened here was not simply a *nolle prosequi*, although the prosecutor used that phrase in his motion. "[T]he power of the prosecutor to nol-pros a charge extends throughout the trial proceedings" and "up until" the

---

orders are "not binding or precedential on our court." *FHP Tectonics Corp*, 2016 IL App (1st) 130291,¶ 45 n.4 (citing *King's Health Spa*, 2014 IL App (2d) 130825, ¶ 63). In general, we do not cite unreported cases. *State Farm*, 2015 IL App (1st) 140447, ¶ 101 ("We will not cite an unreported case."); *Skokie Castings*, 2012 IL App (1st) 111533, ¶ 15 ("an unreported case" is "not binding on any court"); *People v. Moore*, 243 Ill. App. 3d 583, 584 (1993) ("the decision was unreported and of no precedential value"). "Unreported decisions have no precedential value, and this is even more true for decisions from foreign jurisdictions." *American Family Mutual Insurance Co.*, 2014 IL App (1st) 131631, ¶ 38; *Burnette v. Stroger*, 389 Ill. App. 3d 321, 329 (2009); *West American Insurance Co. v. J.R. Construction Co.*, 334 Ill. App. 3d 75, 82 (2002) (a "foreign unreported decision" is of "no precedential value"). Specifically, with respect to unpublished federal cases, this court has held that they do not carry any authority before an Illinois court. *Lyons v. Ryan*, 324 Ill. App. 3d 1094, 1107 n. 11 (2001) ("unreported federal court orders" are not "any kind of authority before an Illinois court"); *Sompolski v. Miller*, 239 Ill. App. 3d 1087, 1093 (1992) ("we decline" to follow "an unreported Federal district court decision"). Nonetheless, we will consider the logic and reasoning of petitioner's argument.

moment that "sentence is imposed." *Artis*, 232 Ill. 2d at 169. In the case at bar, not only was sentence already imposed but the appeal was over, and there were no criminal proceedings pending in state court[28] when the State moved to vacate defendant's conviction.[29] This was not simply a *nolle prosequi*, but a determination by the prosecutor and court that defendant's conviction and sentence had to be vacated. The trial court, which is presumed to know the law, did not use that phrase in its order. *People v. Phillips*, 392 Ill. App. 3d 243, 265 (2009) ("a trial court is presumed to know the law and apply it properly"); *In re N.B.*, 191 Ill. 2d 338, 345 (2000) ("The circuit court is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record."); *People v. Howery*, 178 Ill. 2d 1, 32 (1997) ("the trial court is presumed to know the law and apply it properly"; only "when the record

---

[28] Defendant had filed a *habeas* petition in federal court on May 20, 2011.

[29] The State moved to vacate defendant's conviction and sentence pursuant to section 2-1401, which required filing "not later than 2 years after the entry of the order or judgment." 735 ILCS 5/2-1401(c) (West 2012). However, there is an exception for recent DNA testing (735 ILCS 5/2-1401(c) (West 2012)), and both petitioner and defendant refer repeatedly in their appellate briefs to "recent DNA testing," although without citations to the appellate record. In addition, under "the revestment doctrine," a trial court is revested with jurisdiction over a previously closed matter if both parties: "(1) actively participate in the proceedings; (2) fail to object to the untimeliness of the late filing; *and* (3) assert positions that make the proceedings inconsistent with the merits of the prior judgment and support the setting aside of at least part of that judgment." (Emphasis in original.) *People v. Bailey*, 2014 IL 115459, ¶ 25. Whether the trial court acted pursuant to section 2-1401 or pursuant to the revestment doctrine, its order was still not a *nolle prosequi* and its order did not use that term.

contains strong affirmative evidence to the contrary" is "that presumption *** rebutted").

¶ 66 Petitioner does not contest the propriety of the trial court's decision, and does not provide a transcript or bystander's report for those proceedings. Thus, we must presume that the order was properly entered. *Foutch*, 99 Ill. 2d at 391-92 ("an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim or error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis").

¶ 67 In light of the subsequent determination by the court and prosecutor[30] to vacate defendant's conviction and sentence, petitioner was no longer a victim and hence was no longer an intended beneficiary of the new implementing statute.

¶ 68 Since the new implementing statute does not aid petitioner, we do not need to consider its retroactive effect; and since petitioner has abandoned on appeal any arguments under the old statute, those have been forfeited for our consideration. *E.g., People v. Montes*, 2015 IL App (2d) 140485, ¶ 15 n.1 ("Defendant abandons this claim on appeal and, therefore, we do not address it

---

[30] Although we use the word "and" in this sentence, the statute provides that this determination may be made by either "the prosecutor *or* the court." (Emphasis added.) 725 ILCS 120/3(a) (West Supp. 2015). Thus, a determination by both is not required.

further."). See also *People v. Pendleton*, 223 Ill. 2d 458, 476 (2006) (any issue that an appellant fails to raise in the appellate court is forfeited for further review). Thus, we must conclude that the petitioner lacks standing under the enabling statute where she fails to meet the definition of a victim.

¶ 69 VIII. Necessary Party and Nonparty

¶ 70 Petitioner also argues that she is both a necessary party and a qualifying nonparty. Petitioner claims: (1) that she was a necessary party to defendant's action for a certificate of innocence because she had " 'a present, substantial interest in the matter being litigated' " (*City of Elgin v. Arch Insurance Co.*, 2015 IL App (2d) 150013, ¶34 (quoting *Cameron v. Bartels*, 214 Ill. App. 3d 69, 75-76 (1991))); and (2) that she has standing as a nonparty to file a section 2-401 petition because she was injured by the certificate of innocence. *Hurlbert v. Brewer*, 386 Ill. App. 3d 1096, 1102 (2008).[31] She claims that her "injury"' and "substantial present interest" stem from (1) her "interest in not seeing her rapist released from prison" and the ensuing damage to her reputation; and (2)

[31] "A nonparty to a judgment has no standing to seek relief from that judgment by filing a section 2-1401 petition. [Citation.] Section 2-1401 was never intended to permit a person not a party to the action to intervene after final judgment and reopen the suit so as to permit a new claim to be filed." *In re J.D.*, 317 Ill. App. 3d 445, 449-50 (2000); see also *Hurlbert*, 386 Ill. App. 3d at 1102. However, a few narrow exceptions have been recognized to this rule. *Hurlbert*, 386 Ill. App. 3d at 1102. A nonparty may seek relief under section 2-1401 if the party is: (1) privy to the record; (2) injured by the judgment and will derive benefit from its reversal; or (3) competent to release error. *Hurlbert*, 386 Ill. App. 3d at 1102. Petitioner argues for nonparty status only under the second prong.

the possibility that the certificate of innocence "may" affect her success in the subsequently-filed federal action. First, the order that released defendant from prison was not the certificate of innocence which is at issue in this appeal, but the order vacating his conviction which petitioner does not challenge. Second, as we discussed above, the certificate of innocence was granted pursuant to section 2-702 which specifically provides that it "shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings." 735 ILCS 5/2-702(j) (West 2012).

¶ 71 Our supreme court has held that where a statutory section lists "those that are necessary parties to the proceedings," the omission of "others from that list should be understood as an exclusion." See *In re C.C.*, 2011 IL 111795, ¶ 34. Petitioner's "necessary party" and "nonparty" arguments are just another way of re-arguing her section 2-702 and enabling statute arguments. Those statutes defined with precision and specificity who qualified as an intervening party or as a victim, and her argument here must fail for the same reasons.

¶ 72 CONCLUSION

¶ 73 For the foregoing reasons, we affirm the trial court's order dismissing petitioner's section 2-1401 petition for lack of standing, finding that petitioner lacks standing under sections 2-702, 2-408, and 2-401 of the Code of Civil

Procedure and section 120-3 of the Code of Criminal Procedure of 1963. None of these sections provide petitioner with standing.

¶ 74 Affirmed.

¶ 75 JUSTICE LAMPKIN, specially concurring.

¶ 76 I concur in the judgment only.